**Certiorari Denied, April 16, 2010, No. 32,281**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-041**

**Filing Date: March 2, 2010**

**Docket No. 27,304**

**STATE OF NEW MEXICO,**

     **Plaintiff-Appellee,**

**v.**

**CECILIA VASQUEZ,**

     **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Silvia E. Cano-Garcia, District Judge and V. Lee Vesley, Pro-Tem Judge**

Gary K. King, Attorney General
Andrea Sassa, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**FRY, Chief Judge.**

**{1}** Defendant was convicted of negligently permitting child abuse resulting in death or great bodily harm, contrary to NMSA 1978, Section 30-6-1(D) (2004) (amended 2005 and 2009), and tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003). Defendant appeals her convictions. We conclude that: (1) the jury instruction on negligent child abuse properly incorporated the standard for criminal rather than civil negligence, (2)

there was substantial evidence of the requisite mens rea supporting Defendant's conviction for negligent child abuse, (3) the trial court properly denied Defendant's motion to suppress statements she made to police, (4) the trial court did not abuse its discretion in denying Defendant's motions for change of venue, and (5) the trial court acted within its discretion in sentencing Defendant. We therefore affirm.

**BACKGROUND**

{2}     Defendant's convictions stem from the death of her son following physical abuse by the boy's father. We state the facts necessary for an understanding of Defendant's convictions in the light most favorable to the verdict. In our factual recitations throughout this opinion, we have relied on our review of the record below in addition to those facts set out in the parties' briefs that remained unchallenged. We relate additional facts as necessary in our discussion.

{3}     Defendant had two children with her boyfriend, Freddie Ordoñez—a fifteen-month-old son, Uriah, and a two-year-old daughter. Defendant worked, while Ordoñez cared for their two children. On Tuesday, July 27, 2004, Ordoñez called Defendant while she was at work and told her to come home because something was wrong with Uriah. When Defendant arrived at home, Ordoñez admitted to her that he had become frustrated with Uriah, picked him up by his ears, thrown him into the bathtub, and then picked him up by his neck. Defendant later informed police that Uriah had bruises on his ears, a possible bump on his head, a red mark on his neck, a scrape on his leg, was scared and clingy, seemed weak, was vomiting, had glossy eyes, and had what Defendant described as episodes of twitching over the next two days.

{4}     Defendant stayed home with Uriah on Wednesday, July 28, to watch over him. In describing Uriah's symptoms on Wednesday, Defendant stated that Uriah was vomiting and slept most of the day, that Uriah fell and had a seizure on Wednesday afternoon, and that Uriah continued to have episodes of twitching throughout the night. The next morning, Thursday, July 29, Defendant returned to work and left Uriah in Ordoñez's care. Ordoñez called Defendant while she was at work to tell her that Uriah was twitching. Defendant informed Ordoñez that Uriah had been twitching all night and instructed Ordoñez to feed Uriah a can of soup. Ordoñez then called a second time and told Defendant to hurry and come home. Defendant stated that when she arrived home, Ordoñez was holding Uriah and that Uriah's body was limp in his arms. Ordoñez placed Uriah on the couch and began performing cardiopulmonary resuscitation. There was conflicting evidence as to whether Uriah was still alive when Defendant returned home or whether Uriah was already dead. Defendant testified that she wanted to call emergency personnel to assist Uriah but that Ordoñez would not allow it.

{5}     Shortly thereafter, Ordoñez and Defendant left their home. When they returned, Defendant fell asleep with her daughter. When Defendant awoke on Friday morning, July 30, 2004, she was unable to locate Ordoñez or her son's body. After a series of events not relevant to our analysis, Defendant contacted police in the early morning hours of Saturday, July 31, 2004, to gain assistance in locating her son. Defendant's initial statements to police

did not clearly communicate that Uriah had died but only that Ordoñez had taken Uriah and that Defendant suspected Uriah may be dead. During the course of her approximately twenty-one hours at the police station assisting law enforcement with their investigation, Defendant informed police that her son had died sometime Thursday. Through the investigation, it also came to light that Ordoñez had taken Uriah's body into the desert sometime late Thursday night or early Friday morning and had burned Uriah's remains.

{6}     In her statements to police, Defendant indicated that the events occurring in the preceding days were not the first time Ordoñez had abused Uriah. Specifically, Defendant informed police that Ordoñez had previously abused Uriah in November 2003, that Uriah had marks on his neck and back from where Ordoñez had hit him, and that Defendant had taken Uriah to his paternal grandmother's until Ordoñez had cooled down. Defendant also stated that when Ordoñez would get mad at Uriah, he would "just pick [Uriah] up and he'd throw him in his crib" and that Ordoñez would yell at Uriah and tell him to shut up if he was crying too much. Defendant also informed police that Ordoñez was physically abusive toward her on a regular basis.

{7}     Defendant was indicted on one count of negligently permitting child abuse resulting in death, one count of negligently permitting child abuse not resulting in death or great bodily harm, one count of tampering with evidence, and one count of conspiracy to commit tampering with evidence. The State filed a statement of joinder requesting that Defendant and Ordoñez be tried together. The joint trial against Defendant and Ordoñez commenced in February 2006. Following testimony by the first witness, defense counsel moved to sever Defendant's case, the motion to sever was granted, and the trial court declared a mistrial. Defendant was tried separately.

{8}     At Defendant's trial, Defendant moved for a directed verdict following the close of the State's case. The State agreed to dismiss the charge of negligently permitting child abuse not resulting in death or great bodily harm. The remaining three charges were submitted to the jury. The jury convicted Defendant of negligently permitting child abuse resulting in death or great bodily harm and tampering with evidence. The jury found Defendant not guilty of conspiracy to commit tampering with evidence. The trial court sentenced Defendant to eighteen years' imprisonment on the child abuse charge and three years' imprisonment on the conviction for tampering with evidence. The trial court ordered the sentences to run concurrently.

**DISCUSSION**

{9}     Defendant raises five issues on appeal: (1) her conviction for negligent child abuse should be overturned because the jury was instructed to apply a civil negligence rather than a criminal negligence standard, (2) there was insufficient evidence that she possessed the requisite mens rea for negligently permitting child abuse resulting in death or great bodily harm, (3) the trial court erred in refusing to suppress Defendant's multiple statements to police, (4) the trial court erred in refusing to grant Defendant's multiple motions for a change of venue, and (5) the trial court abused its discretion in refusing to mitigate her sentence based on battered-spouse syndrome. We address each issue below.

3

**Jury Instruction**

{10} We begin by addressing Defendant's challenge to the uniform jury instruction on negligent child abuse. Defendant contends that the uniform jury instruction given in this case, UJI 14-603 NMRA, erroneously allowed the jury to find her guilty of negligent child abuse based on a civil negligence standard. Specifically, Defendant contends that the language in the jury instruction permitting a conviction if Defendant knew *or should have known* her actions or failure to act created a substantial and foreseeable risk is consistent with a civil negligence and not a criminal negligence standard. *See id.* Defendant raises this issue for the first time on appeal. We therefore review Defendant's claim for fundamental error. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (stating that "[t]he standard of review we apply to jury instructions depends on whether the issue has been preserved[,]" and, if the error was not preserved, "we review for fundamental error").

{11} Defendant is correct in asserting that her conviction must be based on criminal negligence, not merely civil negligence. Our Supreme Court determined in *Santillanes v. State*, 115 N.M. 215, 849 P.2d 358 (1993), that a conviction for negligent child abuse pursuant to Section 30-6-1(D) must be based on a criminal negligence standard rather than a civil negligence standard in order to satisfy due process. *Santillanes*, 115 N.M. at 221-22, 849 P.2d at 364-65 ("We interpret the *mens rea* element of negligence in the child abuse statute . . . to require a showing of criminal negligence instead of ordinary civil negligence."). The *Santillanes* Court held that to satisfy a criminal negligence standard there must be "proof that the defendant knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." *Id.* at 222, 849 P.2d at 365. Our uniform jury instruction, UJI 14-603, reflects that holding. *See id.*, Use Notes and Compiler's Annotations.

{12} In *State v. Schoonmaker*, 2008-NMSC-010, 143 N.M. 373, 176 P.3d 1105, our Supreme Court considered whether UJI 14-602 is consistent with the Court's decision in *Santillanes* and embodies a criminal negligence standard or whether the instruction still permits a conviction pursuant to a civil negligence standard. In *Schoonmaker*, a defendant who was charged with negligent child abuse challenged the uniform jury instruction. 2008-NMSC-010 ¶ 42. The defendant argued that the inclusion of "should have known" in the instruction impermissibly permitted a conviction based on a civil negligence standard because criminal negligence in New Mexico requires subjective knowledge of the risk of harm. *Id.* (internal quotation marks omitted). Our Supreme Court disagreed with the defendant in *Schoonmaker*, stating that "[w]hat distinguishes civil negligence from criminal negligence is not whether the person is subjectively aware of a risk of harm; rather, it is the magnitude of the risk itself." *Id.* ¶ 43. The Supreme Court further noted that this interpretation was consistent with the Model Penal Code's definition of criminal negligence, which provides:

> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the

4

nature and purpose of his [or her] conduct and the circumstances known to him [or her], involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

*Id.* (quoting Model Penal Code § 2.02[(2)(d)] (Official Draft and Revised Comments 1962) (emphasis omitted) (internal quotation marks omitted)).

**{13}** Defendant advances no argument distinguishable from those made in *Schoonmaker* but merely relies on the inclusion of the "should have known" language to argue that the instruction permits conviction based on civil negligence. Because this issue has already been directly addressed by our Supreme Court, which upheld the use of UJI 14-602, we are bound by *Schoonmaker*. *See McNeill v. Burlington Res. Oil & Gas Co.*, 2007-NMCA-024, ¶ 19, 141 N.M. 212, 153 P.3d 46 (filed 2006) ("[T]he Court of Appeals may consider error in the Uniform Jury Instructions, except that it may not overrule 'those instructions that have been considered by [the Supreme Court] in actual cases and controversies that are controlling precedent.'" (second alteration in original) (internal quotation marks and citation omitted)), *aff'd*, 2008-NMSC-022, 143 N.M. 740, 182 P.3d 121. Accordingly, we affirm the trial court's use of the uniform jury instruction in this case.

**Substantial Evidence**

**{14}** Defendant contends that there was insufficient evidence to establish that she possessed the required mens rea to support her conviction for negligently permitting child abuse resulting in death or great bodily injury pursuant to the jury instruction discussed above. Defendant does not challenge the sufficiency of the evidence supporting her conviction for tampering with evidence.

**{15}** "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.

> Substantial evidence review requires analysis of whether direct or circumstantial substantial evidence exists and supports a verdict of guilt beyond a reasonable doubt with respect to every element essential for conviction. We determine whether a rational factfinder could have found that each element of the crime was established beyond a reasonable doubt.

*State v. Kent*, 2006-NMCA-134, ¶ 10, 140 N.M. 606, 145 P.3d 86 (citations omitted). We derive the elements of the crime from the jury instructions. *See State v. Smith*, 104 N.M. 729, 730, 726 P.2d 883, 884 (Ct. App. 1986) ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured.").

**{16}** In the present case, the jury was instructed that to find Defendant guilty of negligently permitting child abuse resulting in death or great bodily harm, it was required to find:

5

1.      [Defendant] permitted Uriah . . . to be placed in a situation which endangered the life or health of Uriah . . .;

2.      [D]efendant acted with reckless disregard. To find that [Defendant] acted with reckless disregard, you must find that [Defendant] knew or should have known [D]efendant's actions or failure to act created a substantial and foreseeable risk, [D]efendant disregarded that risk and [D]efendant was wholly indifferent to the consequences of the failure to act . . . and to the welfare and safety of Uriah . . .[;]

3.      [Defendant] was a parent, guardian or custodian of the child, or [D]efendant had accepted responsibility for the child's welfare;

4.      [Defendant's] actions or failure to act resulted in the death of Uriah . . .;

5.      Uriah . . . was under the age of 18;

6.      This happened in New Mexico on or between July 27, 2004[,] and July 29, 2004.

Defendant contends that there was insufficient evidence to support the jury's determination that she acted with reckless disregard as required by the second paragraph of the instruction.

**{17}** In *State v. Chavez*, 2009-NMSC-035, 146 N.M. 434, 211 P.3d 891, our Supreme Court identified several factors that may be considered in determining whether an accused's conduct created a substantial and foreseeable risk to a child. *Chavez* identifies those factors as "the gravity of the threatened harm," whether the defendant's "underlying conduct violates a separate criminal statute," and "the likelihood that harm will occur." *Id.* ¶¶ 23, 25-26. The determinative factor, however, is the gravity of the risk, because "[i]t is the gravity of the risk that serves to place an individual on notice that his [or her] conduct is perilous, and potentially criminal, thereby satisfying due process concerns." *Id.* ¶ 23 (citing *Schoonmaker*, 2008-NMSC-010, ¶ 43) ("What distinguishes civil negligence from criminal negligence is . . . the magnitude of the risk itself." (emphasis omitted) (internal quotation marks omitted)).

**{18}** Although the State does not clearly distinguish the various theories of its case against Defendant, we can discern two theories from the evidence presented: (1) that Defendant failed to procure medical care for Uriah and (2) that Defendant negligently entrusted Ordoñez with Uriah's care and thus permitted Uriah to be abused. With respect to the second theory, the State, based on the evidence at trial, appears to have presented two alternative arguments: (1) that Defendant should have known of the risk of Uriah dying or suffering great bodily harm based on the incidents occurring prior to the July 27 injuries or (2) that once Defendant was aware of the injury on July 27, she was negligent in leaving child in Ordoñez's care on July 29. Because we conclude that there was sufficient evidence to support the jury's verdict based on the theory that Defendant negligently entrusted

6

Ordoñez with Uriah's care after July 27, we do not review the sufficiency of the evidence supporting the State's argument that Defendant was guilty of negligent endangerment based on her failure to procure medical care for Uriah. *See State v. Olguin*, 120 N.M. 740, 740-41, 906 P.2d 731, 731-32 (1995) (holding that due process does not require a general verdict of guilt to be set aside so long as one of the alternative bases for conviction is supported by sufficient evidence and the other bases are not legally inadequate).

**{19}**    Although this Court has previously considered whether a parent should be held criminally liable for permitting abuse of his or her child, those cases were decided under the civil negligence standard employed prior to our Supreme Court's decision in *Santillanes*. *See State v. Williams*, 100 N.M. 322, 324, 670 P.2d 122, 124 (Ct. App. 1983) (upholding a mother's conviction for child abuse based on her failure to protect her child from abuse by the mother's husband because "[s]he lived in the same household with her husband and child, knew of her husband's violent nature, and his use of drugs"), *overruled by Santillanes*, 115 N.M. at 218-19, 225, 849 P.2d at 361-62, 368; *State v. Adams*, 89 N.M. 737, 738, 557 P.2d 586, 587 (Ct. App. 1976) (upholding a father's conviction for child abuse based on his failure to protect his child from the mother's abuse because the father knew of the abuse, and although he was frequently away from home in his occupation as a truck driver, was present for the child's first hospitalization in which the child was diagnosed with severe dehydration, a broken humerus, a broken radius, possible rib fractures, and a previously broken nose), *overruled by Santillanes*, 115 N.M. at 218-19, 225, 849 P.2d at 361-62, 368. In the present case, we consider whether Defendant's act of leaving Uriah with Ordoñez rose to the level of criminal negligence.

**{20}**    The State presented evidence that on July 27, Defendant left work early and returned home at Ordoñez's request, that Ordoñez told Defendant he had picked Uriah up by his ears and threw him in the bathtub, and that Defendant saw physical symptoms suggesting that Ordoñez's actions had caused serious injury to Uriah. These symptoms included bruises on Uriah's ears, marks on his neck and leg, vomiting, weakness, glossy eyes, and episodes of twitching. Defendant stayed home with Uriah on July 28, but on July 29 Defendant returned to work, leaving Uriah in Ordoñez's care. There was evidence presented that Ordoñez called Defendant at work twice that day, the second time urgently insisting that she come home. Defendant returned home to find Ordoñez holding Uriah's limp body in his arms.

**{21}**    From this evidence, a reasonable jury could have concluded that Defendant was aware of the abuse Uriah suffered on July 27, that she left Uriah in Ordoñez's care on July 29, and that she knew or should have known that doing so created a substantial and foreseeable risk of death or great bodily injury to Uriah. Further, there was sufficient evidence to conclude that Defendant's leaving Uriah in Ordoñez's care on July 29 resulted in Uriah's death. Defendant's medical expert, Dr. Brian Fist, testified that the lack of blood stain on the recovered skull fragments indicated that the injury to Uriah that resulted in his death occurred on July 29. Dr. Fist testified that if Uriah had suffered a traumatic head injury on July 27, the brain would have bled until his death on July 29, causing the skull fragments to exhibit signs of blood stain. Although Ordoñez testified that the abuse on July 27 never occurred and that the incident on July 29 was an accident, the jury was free to reject

his testimony. *See State v. Foxen*, 2001-NMCA-061, ¶ 17, 130 N.M. 670, 29 P.3d 1071 (recognizing that conflicts in the evidence are to be resolved by the fact finder).

**{22}** Additionally, we find support for our determination that sufficient evidence exists in *State v. Burrell*, 160 S.W.3d 798 (Mo. 2005) (en banc), and *State v. Fernane*, 914 P.2d 1314 (Ariz. Ct. App. 1995). In *Burrell*, a mother was convicted of one count of endangering the welfare of a child in the first degree where the mother knew of previous incidents of abuse and still allowed the father to have access to the child. 160 S.W.3d at 799-800. The mother was present when the father kicked their two-year-old son hard enough to send him flying to the top of a stairway, kicked the child in the torso while he was lying on the ground, slammed the child's face into the floor, and put his foot on the child's face. *Id.* When the mother spoke with police, she admitted that the child's father had started hitting and choking her when she was still pregnant with the child, that approximately a year later he began hitting and beating the child, and that the abuse had escalated to where he would punch and kick the child. *Id.* at 801. She also informed police that she tried to stop the child's father but that he would beat her when she did. *Id.* The Missouri Supreme Court held that there was "sufficient evidence from which a reasonable trier of fact could conclude that [m]other's act of placing [c]hild in contact with [f]ather . . . resulted in a substantial risk of harm to [c]hild." *Id.* at 802. The court relied on the mother's knowledge of past abuse, the fact that she witnessed the incident of abuse on the day of the child's death and did not take steps to stop the abuse or to remove the child, and the fact that she allowed the child's father to stay with them after the severe beating and, thereby, putting the child in a situation where there was an actual risk of harm to the child, which was realized later that night when the child's father continued the abuse by slapping and kicking the child when he would not wake up. *Id.*

**{23}** In *Fernane*, a mother was convicted of child abuse in connection with the death of her two-year-old daughter based on less direct evidence than was present in *Burrell*. The mother left her daughter with a man with whom she was living. *Fernane*, 914 P.2d at 1315. The Arizona Court of Appeals concluded that there was sufficient evidence to establish that the mother knew she was endangering her daughter by leaving her in this man's care where she had told her daughter's father that she did not trust the man caring for their daughter and that their daughter was afraid of her caretaker, where the mother had been present for instances of previous abuse, and where her daughter would scream when this man came close to her or when they drove into his driveway. *Id.* at 1315-16. The court therefore concluded that the prosecution had proved that "under circumstances likely to cause death or serious physical injury, appellant intentionally or knowingly placed a child in a situation where the child's health or safety was endangered." *Id.* at 1316.

**{24}** In the present case, although Defendant did not witness the abuse on July 27, she was informed of the abuse by Ordoñez. Defendant told police about Uriah being scared and clingy, having bruises consistent with Ordoñez's admission, and that Uriah was vomiting, twitching, and lethargic. Moreover, Defendant had previously witnessed Uriah being abused by Ordoñez. While the November 2003 incident may not have been sufficient to put Defendant on notice that she was placing Uriah at risk on July 27, given the information Defendant received from Ordoñez on July 27, Defendant's knowledge of previous abuse

8

lends support to the jury's conclusion that Defendant acted with reckless disregard for Uriah's health and welfare when she left Uriah in Ordoñez's care on July 29. We conclude therefore that there was sufficient evidence to support the jury's verdict based on Defendant's leaving Uriah in Ordoñez's care on July 29. Accordingly, we do not address the State's alternative argument that Defendant should have been aware that she was endangering Uriah by leaving him in Ordoñez's care on July 27 based on the November 2003 incident of abuse.

**Suppression**

**{25}** Defendant contends that the trial court erred in denying her motion to suppress oral statements she claims were elicited from her in violation of her rights under the Fifth Amendment to the United States Constitution and article II, section 15 of the New Mexico Constitution. The State contends that Defendant failed to preserve a separate claim under article II, section 15 of our state constitution because Defendant only asserted her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), in her written motion to suppress and at the motion hearing. *See State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d 1280 (stating that in order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon). There is no indication in Defendant's reply brief that the State's contention is incorrect. It is Defendant's obligation to demonstrate that she preserved the issue below. *See State v. Rojo*, 1999-NMSC-001, ¶ 44, 126 N.M. 438, 971 P.2d 829 (filed 1998) (stating that an appellate court will not search the record to find whether an issue was preserved where the defendant does not refer the court to appropriate transcript references). Accordingly, to the extent Defendant raises a claim of error under article II, section 15 of our state constitution for the first time on appeal, this Court limits its review to Defendant's properly preserved claim of error raised pursuant to the Fifth Amendment to the United States Constitution.

**{26}** Defendant contends that her statements to police should have been suppressed because she was not first informed of her rights in accordance with *Miranda*. An officer's obligation to administer *Miranda* warnings arises only "when a person is (1) interrogated while (2) in custody." *State v. Wilson*, 2007-NMCA-111, ¶ 12, 142 N.M. 737, 169 P.3d 1184 (internal quotation marks and citation omitted). In reviewing the trial court's determination regarding Defendant's entitlement to the protections of *Miranda*, "we bear in mind that there is a distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts[,] which is subject to de novo review." *State v. Munoz*, 1998-NMSC-048, ¶ 39, 126 N.M. 535, 972 P.2d 847 (alteration in original) (internal quotation marks and citation omitted). In other words, "[w]e determine whether the law was correctly applied to the facts, viewing the facts in the light most favorable to the prevailing party[,] . . . indulg[ing] in all reasonable inferences in support of the [trial] court's ruling and disregard[ing] all evidence and inferences to the contrary." *State v. Bravo*, 2006-NMCA-019, ¶ 5, 139 N.M. 93, 128 P.3d 1070 (filed 2005) (alteration in original) (internal quotation marks and citation omitted).

9

**{27}**     "Custody is determined objectively, not from the subjective perception of any of the members to the interview." *State v. Nieto*, 2000-NMSC-031, ¶ 20, 129 N.M. 688, 12 P.3d 442. A court therefore applies an objective test to resolve whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Wilson*, 2007-NMCA-111, ¶ 14. Because the test is objective, the inquiry is how a reasonable person who is being interviewed by police would have understood his or her situation. *Id.* This Court has identified a number of factors to consider in determining whether a reasonable person would believe he or she is free to leave "includ[ing] the purpose, place, and length of interrogation[,] . . . the extent to which the defendant is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to the defendant." *Bravo*, 2006-NMCA-019, ¶ 9 (internal quotation marks and citation omitted).

**{28}**     The circumstances in the present case are similar to those in *Bravo*. In *Bravo*, the defendant called 911 to report that her four-year-old son had been injured and was unconscious. *Id.* ¶ 2. The defendant's son was taken to the hospital, and police asked that the defendant remain at her home to answer questions regarding her son's injury. *Id.* ¶ 4. The defendant was interviewed by police, but no arrest was made. *Id.* The defendant was questioned again several days later when police went to the defendant's home and asked whether the defendant and her husband would be willing to give another statement. *Id.* ¶ 12. The defendant and her husband agreed to be interviewed and followed the officers to the police station in their own personal vehicle. *Id.* Once at the police station, the defendant "essentially confessed" to having abused her son, and she was allowed to go home with her husband at the conclusion of the interview. *Id.* ¶ 13.

**{29}**     This Court determined in *Bravo* that neither the police officers' questioning of the defendant at her home nor the subsequent questioning of the defendant at the police station was a custodial interrogation. *Id.* ¶¶ 11-13. In reaching this determination, we relied on the fact that for the interview at the defendant's home, she was questioned in familiar surroundings, the questioning took place with the defendant's family members still in the home, the defendant expressed a willingness to speak with the investigator, the defendant's movements were not restricted in any way, and after interviewing the defendant, the officers left her residence. *Id.* ¶ 11. With respect to the subsequent interview at the police station, we considered that the defendant was asked to give another statement and was willing to do so; that the defendant and her husband followed officers to the police station in their own personal vehicle; that the defendant never told the officers that she was tired; that the defendant was never placed in handcuffs or told she was under arrest; and that, despite her confession, the defendant was allowed to go home at the conclusion of the interview. *Id.* ¶¶ 12-13.

**{30}**     Similarly, in the present case, Defendant called police to assist her in locating her missing child, the officer dispatched to Defendant's location spoke with Defendant while she was with a friend in her friend's home, the officer asked Defendant if she would go to the police station, Defendant agreed, and Defendant's friend drove Defendant and her daughter to the police station. Once at the station, Defendant was left unattended in an employee lounge area, where she was permitted to nap, and she was offered food and drink. Defendant

10

was never placed in a locked or secured room, handcuffed, or otherwise restrained. Defendant was not forced, pressured, or threatened, nor was she confronted with evidence of her own guilt. Defendant was forthcoming with information, she wanted to talk to detectives, and she was not advised that she was under arrest or told she could not leave. Defendant never informed officers that she wanted to leave, that she was tired, or that she did not want to give a statement. Further, following Defendant's statements to police, a police officer gave her a ride back to her friend's house and no arrest was made.

**{31}**     We conclude that Defendant was not in custody for purposes of *Miranda*. *See Nieto*, 2000-NMSC-031, ¶ 21 (holding that a suspect was not in custody where the suspect was "asked and agreed to accompany [the] police officers to the station, was free to leave or terminate the interview, and was provided transportation to and from the station" because these facts are "consistent with routine, non-custodial police questioning"); *Munoz*, 1998-NMSC-048, ¶ 43 (holding that a suspect was not in custody where the suspect willingly went with police to be questioned, was not handcuffed or searched, was not interviewed in a locked space, and was taken back home when the interview was completed). We therefore affirm the trial court's denial of Defendant's motion to suppress.

**Change of Venue**

**{32}**     Defendant argues that the trial court erred by denying her multiple motions for change of venue. Defendant moved the trial court for a change of venue both prior to the commencement of her joint trial with Ordoñez and following the mistrial. At the hearing on her first motion for change of venue, Defendant argued that there had been pervasive pretrial publicity that would negatively impact her ability to secure a fair and impartial jury in Doña Ana County. The trial court denied Defendant's motion for change of venue and instead ordered the parties to prepare jury questionnaires that would be sent out to panel members prior to jury selection to see if a fair and impartial jury could be selected in Doña Ana County. The trial court ruled that it would also prepare for the possibility that the jury questionnaires would reveal that a fair and impartial jury could not be selected and that an alternate venue would need to be arranged.

**{33}**     Jury questionnaires were sent out before the first trial. The questionnaires instructed the jury pool to avoid publicity regarding Defendant's case. Following the mistrial, Defendant again moved the trial court for a change of venue, arguing that fourteen members of the jury pool for the first trial had ignored the instruction to avoid publicity and had admitted to reading an article regarding the case in the local newspaper. Defendant also argued that there had been extensive coverage of the trial further impacting her ability to secure a fair and impartial jury. The trial court denied Defendant's motion.

**{34}**     Jury questionnaires were submitted to the new jury panel. Prior to voir dire, the trial court held a hearing to resolve issues raised by the jury questionnaires. At that hearing, the trial court and the parties considered the 248 potential juror questionnaires that were returned, and by agreement of counsel or by decision of the court, 112 potential jurors were struck for cause. Following voir dire, a twelve-person jury and two alternate jurors were chosen.

**{35}** This Court reviews the trial court's venue determination for an abuse of discretion. *State v. House*, 1999-NMSC-014, ¶ 31, 127 N.M. 151, 978 P.2d 967. As our appellate courts have noted in previous cases, "[t]he trial court's discretion in this matter is broad and will not be disturbed on appeal unless a clear abuse of that discretion can be demonstrated." *Id.*; *see State v. Barrera*, 2001-NMSC-014, ¶ 11, 130 N.M. 227, 22 P.3d 1177; *State v. Mantelli*, 2002-NMCA-033, ¶ 54, 131 N.M. 692, 42 P.3d 272. "The burden of establishing an abuse of discretion is borne by the party that opposes the trial court's venue decision." *House*, 1999-NMSC-014, ¶ 31. As the party opposing the trial court's venue decision, it is Defendant's burden to establish an abuse of discretion.

**{36}** A trial court's decision to grant a change of venue may be based on either a presumption that prospective jurors are prejudiced or on evidence of actual juror prejudice. In *House*, our Supreme Court discussed the distinction between actual prejudice and presumed prejudice.

> Actual prejudice requires a direct investigation into the attitudes of potential jurors. Under this inquiry, the court will conduct a voir dire of prospective jurors to establish whether there is such widespread and fixed prejudice within the jury pool that a fair trial in that venue would be impossible. Presumed prejudice, on the other hand, addresses the effect of publicity about a crime upon the entire community where the trial takes place. Under this inquiry, a change of venue should be granted if evidence shows that the community is so saturated with inflammatory publicity about the crime that it must be presumed that the trial proceedings are tainted.

*Id.* ¶ 46 (citation omitted); *see Mantelli*, 2002-NMCA-033, ¶ 55 ("Presumed prejudice makes inferences about the effect of publicity on the community as a whole, while actual prejudice is based upon direct evidence of bias in the minds of the individual prospective jurors."). The choice of whether to grant a change of venue based on presumed prejudice prior to voir dire or to make a determination based on actual prejudice after voir dire is within the sound discretion of the trial court. *See House*, 1999-NMSC-014, ¶ 55 ("[T]he choice of waiting until after voir dire before granting a motion to change venue rests with the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion.").

**{37}** When a trial court has determined that a movant has not demonstrated presumed prejudice and proceeds to voir dire, our Supreme Court has stated that New Mexico appellate courts are limited to a review of the evidence of actual prejudice. *See Barrera*, 2001-NMSC-014, ¶ 16. In limiting the appellate review of a trial court's venue decision, the Court stated that "[a] finding of no actual prejudice following voir dire, if supported by substantial evidence, necessarily precludes a finding of presumed prejudice." *Id.* Although the trial court in this case did not issue a written order finding that no actual prejudice existed, the trial court chose to make a determination based on actual prejudice following voir dire, and once a venire was gathered, the trial court implicitly determined that actual prejudice did not exist by impaneling a jury from the available jurors. *See Stinson v. Berry*, 1997-NMCA-076, ¶ 8, 123 N.M. 482, 943 P.2d 129 ("Where there has been no formal expression concerning a motion, a ruling can be implied by entry of final judgment or by entry of an order

inconsistent with the granting of the relief sought.").  Accordingly, this Court does not review the trial court's determination that Defendant failed to establish presumed prejudice because the trial court chose to make its change of venue determination based on the existence of actual prejudice and implicitly ruled that actual prejudice did not exist.  To the extent Defendant requests this Court to review the trial court's denial of her motion for change of venue based on presumed prejudice, our doing so would exceed the scope of review set out by our Supreme Court in change of venue cases.  We further note that even if this Court were to review the trial court's presumed prejudice determination, based on our review of the record below, Defendant would be unable to demonstrate an abuse of discretion on appeal.

{38}    Moreover, Defendant makes no argument on appeal that any of the impaneled jurors exhibited actual prejudice.  Instead, Defendant's argument on appeal mirrors her argument below, that pretrial publicity, public statements by the district attorney, and the general attitude within the community established that prejudice existed.  However, "[w]hen courts address actual prejudice, the often quoted inquiry . . . is whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant.  Given the state of modern communications, it is not only unnecessary, but realistically impossible to expect jurors to be totally ignorant of the facts and issues of a case." *House*, 1999-NMSC-014, ¶ 51 (internal quotation marks and citations omitted).  Defendant has not identified any individual selected to serve on the jury who indicated he or she could not be impartial. *See Barrera*, 2001-NMSC-014, ¶ 18 (holding that there was no evidence of actual prejudice where the "individuals actually selected for the jury stated that they were either unfamiliar with the case or that they could decide the case based upon the evidence presented at trial"). "Exposure of venire members to publicity about a case by itself does not establish prejudice." *State v. Chamberlain*, 112 N.M. 723, 726, 819 P.2d 673, 676 (1991); *see State v. Hargrove*, 108 N.M. 233, 239, 771 P.2d 166, 172 (1989) (stating that "fairness does not require that jurors be totally ignorant of the facts and issues of the case").  Accordingly, we conclude that Defendant has not satisfied her burden on appeal, and we affirm the trial court's denial of Defendant's change of venue request.

**Sentencing**

{39}    Defendant contends that the trial court abused its discretion by refusing to mitigate her sentence.  The trial court sentenced Defendant to eighteen years in prison based on Defendant's conviction for negligent child abuse resulting in death in violation of Section 30-6-1(D), the basic sentence for a first-degree felony. *See* § 30-6-1(E) ("If the abuse results in great bodily harm or death to the child, he is guilty of a first degree felony."); NMSA 1978, § 31-18-15(A)(3) (2003) (amended 2005 and 2007) ("If a person is convicted of a noncapital felony, the basic sentence . . . for a first degree felony [is] eighteen years imprisonment[.]").  The trial court also sentenced Defendant to a term of three years in prison based on her conviction for tampering with evidence, the basic sentence for a third-degree felony. *See* § 30-22-5(B)(1) ("[I]f the highest crime for which tampering with evidence is committed is a capital or first degree felony or a second degree felony, the person committing tampering with evidence is guilty of a third degree felony."); § 31-18-15(A)(7)

13

("If a person is convicted of a noncapital felony[,] the basic sentence . . . for a third degree felony [is] three years imprisonment[.]").

**{40}** As this Court stated in *State v. Cumpton*, 2000-NMCA-033, ¶ 12, 129 N.M. 47, 1 P.3d 429, "[t]here is no obligation on the part of a judge to depart from the basic sentence. The opportunity for a [trial] court to mitigate a sentence depends solely on the discretion of the court and on no entitlement derived from any qualities of the defendant." While Defendant acknowledges that her sentence is lawful, that it is the basic sentence prescribed by the Legislature, and that the trial court had no obligation to mitigate, Defendant nonetheless argues that her sentence is "unjust and unwarranted" and that the trial court abused its discretion in refusing to mitigate where Defendant presented uncontroverted expert testimony that she needed specific treatment for her battered-spouse syndrome diagnosis.

**{41}** Sentencing is reviewed for an abuse of discretion. *State v. King*, 2007-NMCA-130, ¶ 4, 142 N.M. 699, 168 P.3d 1123 (stating that we review a trial court's sentencing determination for abuse of discretion and questions regarding the legality of a sentence de novo). This Court has previously held that there is no abuse of discretion if the sentence imposed is authorized by law. *See State v. Augustus*, 97 N.M. 100, 101, 637 P.2d 50, 51 (Ct. App. 1981). As we stated in *Cumpton*, "[a d]efendant is entitled to no more than a sentence prescribed by law." 2000-NMCA-033, ¶ 12. Defendant received the sentence prescribed by law in this case. We therefore affirm with respect to this issue.

**CONCLUSION**

**{42}** For the reasons stated above, we affirm Defendant's convictions and sentence.

**{43}** **IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Chief Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**TIMOTHY L. GARCIA, Judge**

**Topic Index for *State v. Vasquez*, No. 27,304**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CL** | **CRIMINAL LAW** |

| | |
|---|---|
| CL-CN | Child Abuse and Neglect |
| CL-TE | Tampering with Evidence |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-MW | Miranda Warnings |
| CT-SL | Self-incrimination |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-CV | Change of Venue |
| CA-MR | Motion to Suppress |
| CA-SI | Self-incrimination |
| CA-SN | Sentencing |
| CA-SE | Substantial or Sufficient Evidence |
| | |
| **JI** | **JURY INSTRUCTIONS** |
| JI-CJ | Criminal Jury Instructions |
| JI-IJ | Improper Jury Instructions |