This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

   Plaintiff-Appellee,

v.                                                                    **No. A-1-CA-36318**

**LORETTA VILLALOBOS,**

   Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**James L. Sanchez, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Aja Oishi, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### MEMORANDUM OPINION

**B. ZAMORA, Judge.**

**{1}**   Defendant Loretta Villalobos appeals her convictions for negligent abuse of a child resulting in death (child abuse) and two counts of contributing to the delinquency of a minor (CDM). Defendant challenges the sufficiency of the evidence supporting each conviction and contends that the jury instruction for the child abuse charge resulted in fundamental error because it failed to instruct the jury on recklessness. Because we agree that there was insufficient evidence to support Defendant's child abuse conviction we need not address Defendant's claim regarding the jury instruction. We affirm each of Defendant's CDM convictions.

**BACKGROUND**

**{2}** This case stems from the tragic death of Alex (Victim), who was alleged to have been murdered by Defendant's fifteen-year old son, Brandon.[1] Victim, age twelve, lived with his mother in Albuquerque, but often spent time with his aunt in Meadow Lake located in Valencia County. Victim's aunt lived less than two miles away from Defendant's residence. Victim and Brandon had been friends for approximately three or four years. Brandon is intellectually disabled and, according to Defendant, needed to be supervised.

**{3}** On February 17, 2014, Victim was at Defendant's residence visiting with Brandon where he intended to spend the night. The boys left the residence without supervision around 6 or 7 p.m. When later questioned by law enforcement, Defendant told police in a recorded interview that, "[Victim and Brandon] said they were going to be outside, but by the time I came out they were gone." Brandon later came home without Victim, informing Defendant that "they were jumped" by three male subjects. Defendant and Brandon walked around the neighborhood yelling for Victim in an attempt to find him, but were unable to do so. Defendant returned home, assuming that Victim had gone to his aunt's house.

**{4}** The following morning Victim's aunt arrived at Defendant's residence to pick Victim up, but he was not there. Victim's aunt testified that Defendant told her Victim wasn't there, that the night prior three men had chased and shot at them, and Defendant offered to help aunt look for Victim. Instead, Victim's aunt called the police.

**{5}** Later that day, law enforcement, including Detectives David Zilink[2] and Alejandro Lara, arrived at Defendant's residence. Both Detectives recounted statements made by Defendant while they were initially questioning her about where Victim and Brandon had gone the previous night. Those statements could be construed as inconsistent with the statements that Defendant made a day later in a recorded interview. Detective Zilink testified that, upon arriving at her residence, Defendant informed him that Victim and Brandon had gone out to an abandoned home. In her initial statement to Detective Lara, Defendant told him that the boys went out the previous night to walk around Meadow Lake and to vandalize and break into abandoned homes.

**{6}** Detective Zilink also testified that he spoke with Brandon and learned that a tire iron had been used the night Victim was killed. When Detective Zilink relayed this information to Defendant, she responded that the tire iron was underneath a pool table and offered it to Detective Zilink if he wanted it. In response to later questions from law enforcement regarding why Defendant was not supervising Brandon or why she did not attempt to go after them after they initially left, she responded that this was common behavior for the two boys and that Brandon "didn't want to listen to us that night. He just

---

1A grand jury indicted Brandon for murder and tampering with evidence. *See State v. Brandon V.*, D-1314-YR-2014-00002. As of the date of this opinion, his case is still pending. However, during the trial in this case the parties did not appear to dispute that Brandon was the individual who killed Victim.

2Detective Zilink initially responded to the home of Victim's aunt, but then proceeded to Defendant's residence.

took off." Police later discovered Victim's body under a mattress in an open dirt field approximately a half mile or a mile from Defendant's residence.

**{7}** Dr. Lori Proe, a forensic pathologist, performed the autopsy of Victim and determined that Victim's cause of death was blunt trauma, which she described as "any sort of injury that occurs when the body is impacted by a blunt object or impacts a blunt object[.]" Dr. Proe testified that a tire iron could have inflicted the injuries Victim sustained. Victim sustained numerous internal and external injuries, including bleeding in the scalp, the skull and around the brain, as well as multiple skull fractures. Dr. Proe could not determine if any single injury was instantly fatal. Although it was possible medical intervention could have saved Victim, Dr. Proe was unable to determine how long Victim lived after he sustained the injuries. She testified that Victim could have survived a few minutes or several hours. Ultimately, Dr. Proe concluded that the manner of Victim's death was homicide.

**{8}** A grand jury indicted Defendant on child abuse recklessly permitted resulting in death, contrary to NMSA 1978, § 30-6-1 (2009), and two counts of contributing to the delinquency of a minor, contrary to NMSA 1978, § 30-6-3 (1990). Subsequently, a jury convicted Defendant of all counts. Defendant appealed.

## DISCUSSION

### I. Standard of Review

**{9}** In reviewing the sufficiency of the evidence this Court will "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. We "indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences" that support a different result. *Id.* "Contrary evidence supporting acquittal does not provide a basis for reversal[.]" *Id.* The jury instructions given by the district court "become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Schackow*, 2006-NMCA-123, ¶ 8, 140 N.M. 506, 143 P.3d 745.

### II. There was Insufficient Evidence to Convict Defendant of Child Abuse

**{10}** Defendant challenges the sufficiency of the evidence supporting her conviction for child abuse. In New Mexico, child abuse by endangerment is defined as "negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health[.]" Section 30-6-1(D)(1). Although Defendant

was charged with child abuse based on negligence, Defendant's conduct must have been more than merely negligent or careless. UJI 14-621 NMRA. Instead, Defendant must have permitted "a substantial and justifiable risk of serious harm to the safety or health of [Victim]." *Id.* "A substantial and unjustifiable risk is one that any law-abiding person would recognize under similar circumstances and that would cause any law-abiding person to behave differently than [Defendant] out of concern for the safety or health of [Victim.]" *Id.* For Defendant to be criminally liable for child abuse by endangerment, she must have been aware of a particular danger to Victim when engaging in the conduct that created the risk of harm. *State v. Gonzales*, 2011-NMCA-081, ¶ 1, 150 N.M. 494, 263 P.3d 271, *aff'd on other grounds*, 2013-NMSC-016, ¶ 3, 301 P.3d 380; *see* § 30-6-1(A)(3) (stating "negligently" means "that a person knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child.").

**{11}** On appeal, Defendant makes two arguments. First, Defendant argues that the State did not present any evidence that Defendant could have foreseen that Brandon would kill Victim. Next, she contends she did not cause Victim's death when she failed to check on him after he was injured. The State does not argue the evidence is sufficient to support Defendant's conviction and instead states "[w]e leave it to the [appellate] Court to determine whether Defendant's conviction for recklessly permitting child abuse by endangerment is supported by sufficient evidence." We address each of Defendant's arguments in turn.

## A.    Foreseeability

**{12}** We first analyze whether, viewing the evidence in the light most favorable to the guilty verdict, Defendant "knew or should have known of the danger involved"—whether Victim's murder was foreseeable. Section 30-6-1(A)(3). The evidence presented by the State of a foreseeable risk to Victim was that Brandon, Defendant's intellectually disabled son, had a history of vandalizing abandoned homes, was frequently truant from school, and would become angry and yell. In addition, Defendant also admitted to knowledge of two prior instances of aggression. About a year prior to Victim's death, Brandon had a physical altercation with his father and he had an outburst several days prior to Victim's death. During the outburst, Brandon threw a television[3] and a kitchen chair. Law enforcement was dispatched to Defendant's home, but chose not to arrest Brandon, despite Defendant admitting "her son was out of control and had thrown some things," and that it was "an ongoing incident with him."

**{13}** The record is devoid of any evidence that Brandon had violent tendencies towards Victim or that he had ever used a weapon to harm another person. There was also no evidence that Defendant saw either Brandon or Victim take the tire iron with them on the evening of February 17, 2014, or that they were angry at each other. Rather, the evidence showed that for years they had been friends. Indeed, the State

---

3Testimony by the deputy who had responded to the incident indicated that Brandon had thrown a television. Defendant alternatively stated to Detective Lara that Brandon had "punched a TV" because "he wasn't on his meds."

presented no evidence that Defendant knew Brandon had violent proclivities and placed Victim in danger when she allowed the two to leave unsupervised. *See State v. Vasquez*, 2010-NMCA-041, ¶¶ 20-21, 148 N.M. 202, 232 P.3d 438 (holding that that the defendant created a substantial and foreseeable risk of death or great bodily injury to her fifteen-month-old baby when she was aware of previous abuse perpetrated by the baby's father, but continued to leave the baby in his care). Instead, Defendant stated to Detective Lara that Brandon was "fine with other people" and not violent towards his family members. The evidence the State presented at trial fails to establish that there was a foreseeable risk to Victim when he left Defendant's home with Brandon, his long-time neighborhood friend.

## B. Causation

**{14}** The State alternatively argued below that Defendant caused Victim's death when she failed to render aid to Victim. The State maintained that had Defendant immediately taken steps to locate Victim, he might have received medical treatment and his death might have been prevented. "Under a theory of medical neglect that results in death or great bodily harm, the State must prove more than just the neglect itself." *State v. Nichols*, 2016-NMSC-001, ¶ 40, 363 P.3d 1187. Instead, the State had the burden of proving, with medical evidence, that if Victim had obtained medical care earlier, he "would have lived or at least would have had a significantly greater chance of living[.]" *Id.* Without proof of causation, the charge of child abuse resulting in death or great bodily harm fails for lack of evidence. *Id.* ¶ 39; *State v. Consaul*, 2014-NMSC-030, ¶ 43, 332 P.3d 850 (indicating that the state had to prove that the act of swaddling a baby tightly in a blanket and placing him face down on a pillow "actually caused the great bodily harm" that the baby suffered).

**{15}** Here, after hearing Brandon's claim that Brandon and Victim were "jumped by three men," Defendant failed to verify Victim was safe—she failed to find Victim, failed to contact Victim's aunt, and failed to call police. However, to convict Defendant, the State had to prove that these failures to act actually caused Victim's death. While Defendant's behavior might be described as irresponsible, the nexus between Defendant's conduct and Victim's death is lacking.

**{16}** Dr. Proe could not opine on an estimated time between the blunt trauma to Victim and his death. Dr. Proe could not state whether the death happened in "five minutes or five hours." Moreover, the record was silent as to when Brandon returned home and when or for how long he and Defendant went looking for Victim. There is no timeline that would allow the jury to find that had Defendant located Victim, medical intervention would have saved his life. The State failed to prove that if Defendant had obtained medical care earlier, Victim "would have lived or at least would have had a significantly greater chance of living." *Nichols*, 2016-NMSC-001, ¶ 40. Hence, the jury was left to speculate that if Defendant had more reasonably responded to Brandon's report of being attacked, then Victim could have been located prior to his death *and* doctors would have had the time and ability to treat him successfully. *See id.* ¶¶ 43-44. However, "a suggestion that 'maybe' or 'perhaps' something would or would not have

happened, even if based on evidence, is not probative of anything." *Id.* ¶ 45. Thus, the State failed to put forth substantial evidence that Defendant's conduct resulted in Victim's death. *See Consaul,* 2014-NMSC-030, ¶ 49 ("Without any proof of causation, the charge of criminal negligence (or now criminal recklessness) completely fails for lack of substantial evidence[.]").

**{17}** Indisputably, Victim suffered a tragic death and we fully recognize the "compelling public interest in protecting defenseless children." *State v. Ramirez,* 2016-NMCA-072, ¶ 27, 387 P.3d 266 (internal quotation marks and citation omitted). However, a conviction cannot stand "where evidence must be buttressed by surmise and conjecture, rather than logical inference." *State v. Leal,* 1986-NMCA-075, ¶ 17, 104 N.M. 506, 723 P.2d 977. We hold that there was insufficient evidence to convict Defendant for child abuse.

### III.    Substantial Evidence Supports Defendant's Convictions for CDM

**{18}** Defendant next challenges the sufficiency of the evidence for both her CDM convictions arguing that the State failed to present evidence that Defendant had knowledge that, on the date Victim was killed, Victim and Brandon left her house "with the intent to vandalize property." Relying on her recorded interview, Defendant contends that the interview only proves that she was aware of a prior incident in which Victim and Brandon vandalized an abandoned home. The State argues that evidence aside from Defendant's recorded interview established that Defendant knew Brandon and Victim left her house to vandalize homes on the night of the murder. We agree with the State.

**{19}** "Contributing to the delinquency of a minor consists of any person committing any act or *omitting the performance of any duty*, which act or *omission* causes or tends to cause or encourage the delinquency of any person under the age of eighteen years." NMSA 1978, § 30-6-3 (1990) (emphasis added). "In order to prove the offense of CDM, in violation of Section 30-6-3, the [s]tate does not need to prove that [the d]efendant's acts had any particular effect on the victim; it is enough that his acts encourage the child to engage in delinquent behavior." *State v. Lucero,* 1994-NMCA-129, ¶ 9, 118 N.M. 696, 884 P.2d 1175. The State had to prove beyond a reasonable doubt that: (1) "[D]efendant allowed [Victim and/or Brandon] to leave with the intent to vandalize property"; (2) "[t]his encouraged [Victim and/or Brandon] to commit the offense of criminal damage to property o[r] to conduct themselves in a manner injurious to their morals, health or welfare"; and (3) "[Victim and/or Brandon were] under the age of 18." UJI 14-601 NMRA. Only the first two elements appear to be disputed.

**{20}** The State presented evidence that Defendant knew Victim and Brandon left her home on the evening of February 17, 2014, to vandalize or break into abandoned homes. Detective Lara spoke with Defendant at her residence on February 18, 2014, and again the following day for a second interview outside Defendant's residence. Defendant's first statement to Detective Lara at her residence on February 18, 2014, was unequivocal. Defendant stated Victim and Brandon had left her custody on that

evening to vandalize and break into abandoned homes, which is established by the following exchange between Detective Lara and the prosecutor at trial:

> Prosecutor: Okay. Were you given any information by [Defendant] about where the boys had gone?
>
> Detective Lara: Yes. She said that they went out walking around Meadow Lake out to the Meadow Lake Community Center. She said that they went out vandalizing abandoned homes and breaking into homes.
>
> Prosecutor: And did she give you any indication if she was aware that that's why they had gone out that night?
>
> Detective Lara: Yes, she was completely aware. She said this isn't the first time they have done this. She is aware of this behavior from them.

**{21}** Consequently, it was immaterial what Defendant said in the subsequent recorded interview because the jury could have inferred the requisite knowledge based on Defendant's initial statement to Detective Lara. *See Montoya*, 2015-NMSC-010, ¶ 52 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." (internal quotation marks and citation omitted)).

**{22}** Thus, we conclude that there is substantial evidence to support both convictions, one for Victim and one for Brandon, because "[t]he language of the [CDM] statute appears to evince an intent to punish each act affecting each minor." *State v. Barr*, 1999-NMCA-081, ¶ 17, 127 N.M. 504, 984 P.2d 185.

**CONCLUSION**

**{23}** For the aforementioned reasons, we reverse Defendant's conviction for child abuse and affirm her convictions for CDM.

**{24} IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**WE CONCUR:**

**JULIE J. VARGAS, Judge**

**JACQUELINE R. MEDINA, Judge**