582 P.2d 1296
**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Billy Richard UTTER,
Defendant-Appellant.**

No. 3321.

Court of Appeals of New Mexico.

June 27, 1978.

Rehearing Denied July 10, 1978.

Writ of Certiorari Denied Aug. 18, 1978.

John B. Bigelow, Chief Public Defender, Santa Fe, Mark Shapiro, Asst. Appellate Defender, Steven H. Schiff, Albuquerque, for appellant.

Toney Anaya, Atty. Gen., Robert G. Sloan, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

LOPEZ, Judge.

Defendant Utter appeals his jury conviction for child abuse resulting in death contrary to § 40A–6–1C, N.M.S.A.1953 (2d Repl. Vol. 6, Supp.1975). We affirm.

The defendant presents two points for reversal: (1) a jury instruction allowing the jury to find child abuse resulting in death in six alternative ways deprived Mr. Utter of his right to a unanimous verdict; and (2) the admission of defendant's confession was error because the police did not comply with *Miranda* and his statement was not voluntary.

Two other points raised in the defendant's docketing statement have not been

briefed and are deemed to have been abandoned. See *State v. Vogenthaler,* 89 N.M. 150, 548 P.2d 112 (Ct.App.1976).

In June of 1977, Mr. Utter, his wife and five week-old daughter were living in a motel in Bernalillo County, New Mexico. Defendant and a friend had been drinking wine during the day. About 2:30 a. m. Mr. Utter was awakened by the baby's crying and found his wife was not home. The evidence regarding what then transpired is conflicting. According to a statement which the defendant signed on June 29, 1977, when he went in to change the baby, he discovered she had breathing problems. He then notified his neighbors at the motel. At that time the defendant could offer no explanation for the baby's injuries. There is also evidence that the defendant became furious and threw the baby. The baby died a few days later as a result of bodily injuries. Further, on July 8, Mr. Utter gave the arresting officer a second statement in which he incriminated himself. The defendant moved to suppress this statement and the trial court denied the motion. The cause proceeded to trial and the jury found him guilty of child abuse resulting in death. From this conviction, defendant appeals.

Point I

*The jury instruction on abuse of a child resulting in death was proper because it was supported by substantial evidence introduced at trial and did not deprive defendant of his right to a unanimous verdict.*

■ Under this point, the defendant challenges Instruction no. 2, claiming that the instruction judicially sanctioned a verdict which was not unanimous. He objected on the grounds that separate instructions should have been prepared and given to the jury for each of the six ways in which the child abuse statute could be violated because the jury could render a verdict of guilty without agreement on which of the six alternative elements defendant had committed. The court's Instruction no. 2 reads as follows:

For you to find the defendant guilty of Abuse of a Child Resulting in Death, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The Defendant did cruelly punish Jeanette Utter, a child, or did place her in a situation dangerous to her health;

2. That Defendant did this act knowingly, intentionally or negligently;

3. That the act was without justifiable cause;

4. That said act resulted in the death of Jeanette Utter;

5. That this happened in New Mexico on or about the 29th day of June, 1977.

Instruction no. 2 was based on § 40A–6–1C, supra, which reads as follows:

C. Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be:

(1) placed in a situation that may endanger the child's life or health; or

(2) tortured, cruelly confined or cruelly punished; or

(3) exposed to the inclemency of the weather.

Whoever commits abuse of a child is guilty of a fourth degree felony, unless the abuse results in the child's death or great bodily harm, in which case he is guilty of a second degree felony.

The defendant offered no instructions on this issue. The State argues that technically, the defendant waived his right to appeal because he failed to preserve the alleged error by offering alternative written instructions. Section 41–23–41b, N.M.S.A. 1953 (2d Repl. Vol. 6, Supp.1975). We disagree.

Section 41–23–41d, N.M.S.A.1953 (2d Repl. Vol. 6, Supp.1975) provides in pertinent part:

. . . objection to any instruction given must be sufficient to alert the mind of the court to the claimed vice therein, or, in the case of failure to instruct on any issue, a correct written instruction must be tendered before the jury is instructed . . . .

The defendant objected properly and timely, and although he did not offer any counter-instruction, the court was aware of his objection to the instruction. Defendant did not waive his right to present this issue on appeal.

■ Defendant's argument, however, that Instruction no. 2 sanctioned a verdict which was not unanimous is without merit. The instant case is analogous to *State v. Gurule,* 90 N.M. 87, 559 P.2d 1214 (Ct.App. 1977), *cert. denied,* 90 N.M. 254, 561 P.2d 1347 (1977). *Gurule* involved the paying *or* receiving *or* causing payment to be made for services not rendered. The defendant in that case challenged the alternative language of the indictment which charged one crime committed in varying ways as not providing him notice of the crime charged in sufficient detail to prepare his defense. This Court held that the charge in the indictment followed the language of the statute, and the charge was not legally deficient just because the indictment charged one crime which could be committed in possibly varying ways. *Gurule,* supra, at 91, 559 P.2d 1214.

In the instant case the court's Instruction no. 2 was based on the child abuse statute. We see no difference between an indictment in the alternative, in which the charge follows the language of the statute, and the giving of an instruction which includes alternative intent requirements based on the language of the statute. If the alternative charging in *Gurule,* supra, could not be legally deficient, we do not see how the instruction in the instant case would be legally deficient.

The defendant's sole authority on the issue of unanimity of a verdict is *United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977). *Gipson,* is distinguishable from the case at bar. In *Gipson* the defendant was involved in a stolen car operation. The statute read alternatively, "Whoever receives, conceals, stores, barters, sells or disposes of any motor vehicle . . . ." The jury instruction given in *Gipson,* supra, was also given in the alternative. The jury asked the trial court whether they had to agree on which of the six acts the defendant committed, or if it was sufficient if they unanimously concluded he committed any of the six acts. The trial court instructed the jury that it was sufficient if they found that the defendant had committed any of the six acts. As explained in *United States v. Bolts,* 558 F.2d 316 (5th Cir. 1977):

> Gipson involved a situation where the court expressly sanctioned a non-unanimous verdict; *the jurors were told that they could disagree* as to what particular acts were committed, as long as each juror found that one of the acts had been done. [Emphasis added].

In the instant case, the fact that the instruction was in the alternative does not mean that the jury reached a non-unanimous verdict. There is no evidence to this effect. The trial court expressly instructed the jury in Instruction no. 1 that the verdict must be unanimous. When the jury rendered the verdict, they were asked by the trial court if their verdict was unanimous; they indicated it was. This Court has no reason to assume that an inconsistent or alleged compromise verdict is not unanimous, and no justification exists for inquiring into the logic behind a jury verdict. See *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943); *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1931).

■ Further, to determine whether the instruction was properly given, we look at whether the instruction given conformed to the evidence at trial. We have reviewed the record and conclude that the record contains substantial evidence to support the giving of Instruction no. 2.

The verdict reached did not violate any right of the defendant to a unanimous jury verdict under either our state or federal constitution.

Point II

*Defendant was advised of and knowingly and intelligently waived his Miranda rights prior to making his voluntarily given statement.*

At the pre-trial hearing on the motion to suppress there was conflicting evidence regarding whether defendant effectively invoked his right to counsel, and whether he was informed of his *Miranda* rights and knowingly and intelligently waived them.

■ There is substantial evidence that defendant was advised of his constitutional rights before making a statement and that he made his statement voluntarily. *State v. Ramirez,* 89 N.M. 635, 556 P.2d 43 (Ct. App.1976). Further, it is for the trial court to resolve the conflicts in the evidence at the suppression hearing, and this Court should not substitute its own judgment for that of the trial court. *State v. Ramirez, supra; State v. Burk,* 82 N.M. 466, 483 P.2d 940 (Ct.App.1971).

The alleged errors claimed by defendant have no basis, and the judgment should be affirmed.

IT IS SO ORDERED.

HERNANDEZ, J., concurs.

SUTIN, J., dissenting.

SUTIN, Judge (dissenting).

I dissent.

I adhere to my position stated in *State v. Lucero,* 87 N.M. 242, 531 P.2d 1215 (Ct.App. 1975) that § 40A–6–1, N.M.S.A.1953 (2d Repl.Vol. 6, 1973) is unconstitutional.

Furthermore, the facts illustrate why today's *Miranda* warnings require additional safeguards to effectively protect an individual's Fifth and Sixth Amendment rights. I do not carry a bag of sympathy on my back for defendant as I write down the avenue of constitutional rights. These rights have been heralded in the courts for 200 years.

On June 29, 1977, the police went to the motel in which Utter was staying to question him about the death of his child. Utter was read his *Miranda* rights and was told that he was a suspect in the case. He then voluntarily accompanied the officers to the police station where he signed an acknowledgment and a waiver of his rights before giving the police a written statement. At this time Utter was not charged with a crime nor held in custody.

On July 8, 1977, pursuant to a Grand Jury Indictment, Utter was arrested in Taos for a crime, the conviction of which he is now appealing. At the time the Albuquerque police arrested Utter he was in the Taos jail having been taken into custody for drinking in public, though the Taos police had neither given him his *Miranda* rights nor formally charged him with this violation.

On the day of his arrest for child abuse, Utter was trembling and shaking as he was driven by the Albuquerque police from Taos to Albuquerque. He was *not* readvised of his *Miranda* rights *prior* to this journey. He testified that he told the police officers he wanted to speak with a lawyer before talking to the police; that he wanted to hire a local Albuquerque attorney who once represented his sister, and that the police officer asked him why he would spend ten thousand dollars to hire an attorney when he could get a public defender for free. In contrast, the police officer testified that defendant made no specific statement requesting an attorney; that a reference was made to the law firm only in the context of their representation of the defendant for a land sale in New Jersey; and that the officer did not try to dissuade defendant from representation by the attorney. At least twice during the course of the drive the police told Utter that his statement on June 29 had not been the truth, that they had medical evidence to the contrary and that the defendant's conscience would feel better if he were to talk to the police. In other words, Utter was subjected to custodial interrogation.

During the ride from Taos to Albuquerque, Utter either made essentially the same incriminating statement that he was later to give on tape to the police or said that he would give such a statement when he got to Albuquerque. At Utter's request, upon arriving in Albuquerque, the police notified his wife that he was in custody; the police did not contact the law firm or any other attorney for Utter. At the Albuquerque police station, Utter was advised of his *Miranda* rights and signed a waiver of them.

Utter then gave a statement which was tape recorded and stenographed. This statement was never signed because while it was being typed an attorney from the Public Defender's office, having been contacted by Utter's wife, arrived to counsel Utter. From these facts the trial judge found that Utter had not invoked his right to remain silent or his right to counsel.

As required by *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) the defendant was not advised on July 8 that "prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." [86 S.Ct. at 1630.] The State, alleging that defendant waived these rights, submitted two statements of waiver made by defendant on June 29 and July 8 as State's Exhibits Nos. 1 and 2. The trial court refused to suppress the oral statement taken on July 8, 1977, but the trial court did not find that Utter voluntarily, knowingly and intelligently waived his right to remain silent and his right to counsel.

In *State v. Greene,* 91 N.M. 207, 572 P.2d 935, 941 (1977), Justice Federici said:

> We hold that (1) once a person is arrested and has asserted his right to counsel he may, upon receiving *new and adequate "Miranda* warnings," change his mind for reasons satisfactory to himself and voluntarily submit to questioning, and (2) once the right to counsel has been effectively invoked, *the State bears a heavy burden in demonstrating that a subsequent waiver is knowing and voluntary.* [Emphasis added.]

On July 8, Utter did not receive "new and adequate warnings" prior to the statements made. Neither did the State bear the heavy burden if Utter had actually asserted his right to counsel. The trial court believed the police and not Utter. I have no quarrel with this conclusion, but a higher standard for the waiver of fundamental rights should be adopted.

Before initiating a discussion which could lead to any form of interrogation, the police officer should not only remind the individual in custody of his *Miranda* rights, he should seek an explicit answer as to the individual's waiver of those rights. For instance, the police might say, "Mr. Utter, you have the right to an attorney before you talk to me. Do you want an attorney here before talking to me?" If Utter responds with an unequivocal "No, I do not want an attorney" then the police may proceed to question him; if he says "Yes" prior to or during the questioning, the police must either desist from or terminate the interrogation.

These requirements form the holding of *Sullins v. U. S.,* 389 F.2d 985 (10th Cir. 1968). In that case defendants were given their *Miranda* rights twice by two different sheriffs immediately after their arrest. During the drive to the sheriff's office defendants made incriminating oral statements which were of the "same general tenor" as the written statements which they subsequently signed two days after their arrests. Defendants had been advised of their *Miranda* rights at least five times during the course of two days and each had executed a signed waiver of rights before giving his or her written statement to the police.

At the hearing on the motion to suppress the written statements, defendants contended that they had asked for counsel immediately upon their arrival at the sheriff's office "and on several subsequent occasions." The police denied that "any one of them had at any time asked to have counsel present at their interrogation." The court found it crucial that

> [t]he officers did testify, however, *that at no time had any one of the four expressly said that he or she did not want to consult a lawyer before making a statement.*
> . . .
> *The testimony of the officers that none of the accused specifically declined consultation with a lawyer before answering questions is fatal to the admissibility of their inculpatory statements* for the

Court in *Miranda v. United States,* supra, pointed out . . . that not only does "a heavy burden" rest upon the Government to show a waiver of the constitutional privilege against self-incrimination and the right to retained or appointed counsel but also that waiver is never to be presumed from failure to ask for counsel. . . .

\*   \*   \*   \*   \*   \*

The written statements given after execution of the notices and waivers of constitutional rights do not stand in any better position than the oral statements previously made. The written statements merely reiterate the preceding oral statements. They were made after the damage had been done. [Emphasis added.] [389 F.2d at 988.]

Contra: *Daro v. U. S.,* 380 F.2d 23 (10th Cir. 1967); *Bond v. U. S.,* 397 F.2d 162 (10th Cir. 1968); *U. S. v. Montos,* 421 F.2d 215 (5th Cir. 1970); *U. S. v. Hayes,* 385 F.2d 375 (4th Cir. 1967).

In addition, today's *Miranda* warnings do not inform the individual that if he chooses to remain silent, his silence will not operate as evidence against him. The absence of a warning of this kind leads many suspects to speak who would not do so otherwise. A person facing arrest might hope that arrest or prosecution could be avoided by talking with the police; that cooperation will lead the police and prosecutor to believe in the suspect's innocence. The suspect should be given a clear understanding of the consequences of exercising his right to remain silent so that he can more intelligently choose whether or not to try to talk his way out of arrest. See Elsen & Rosett, *Protections for the Suspect Under Miranda v. Arizona,* 67 Colum.L.Rev. 645 (1967).

It has been suggested that a knowing and intelligent waiver of one's rights to counsel and against self-incrimination is practically impossible because any disclosure under our adversary system of criminal justice is potentially damaging. *Interrogation of Criminal Defendants—Some Views on Miranda v. Arizona,* 35 Fordham L.Rev. 169, 233 (1966). One philosophy is that interroga-

tion should never be permitted without counsel present and no statements made in the absence of counsel should be admissible.

I would not go to these lengths in implementing *Miranda,* but I do recommend a higher standard for the waiver of fundamental rights.