723 P.2d 977

**STATE of New Mexico,**
**Plaintiff-Appellee,**

v.

**Gracie LEAL, Defendant-Appellant.**

**No. 7945.**

Court of Appeals of New Mexico.

July 29, 1986.

Paul G. Bardacke, Atty. Gen., Alicia Mason, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Jacquelyn Robins, Chief Public Defender, Deborah A. Moll, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

MINZNER, Judge.

Convicted by a jury of one count of child abuse resulting in death, in violation of NMSA 1978, Section 30–6–1(C)(2) (Repl. Pamp.1984), defendant appeals. This court reversed defendant's conviction, after assignment to the summary calendar, over the state's objection. *See State v. Leal,*

Ct.App.No. 7945 (Filed August 21, 1984). Having granted certiorari, the supreme court reversed and remanded the case for reassignment to the limited calendar. *See State v. Leal*, 103 N.M. 299, 706 P.2d 510 (1985).

On appeal, defendant argues that: (1) defendant's conviction for permitting her child to be cruelly punished is not supported by substantial evidence, and (2) the trial court erred in not submitting defendant's requested jury instructions defining "negligently" and "permit." Having reviewed the briefs and record after assignment to the limited calendar, we again reverse. Because of our holding on the first issue, we do not reach the second.

*Background*

On October 25, 1983, defendant was charged by criminal information with knowingly, intentionally, or negligently, and without justifiable cause, permitting her daughter, K.L., to be cruelly punished, as a result of which K.L. died on November 18, 1982. Defendant was charged with a violation Section 30–6–1(C)(2), which reads in pertinent part: "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be * * * tortured, cruelly confined or cruelly punished[.]" Defendant did not testify at the trial nor did she call any witness to testify. She was convicted as charged.

William Young and Charles Fisher, the ambulance attendants who transported K.L. from the house to Lea Regional Hospital, testified for the state. Young testified that on November 14, 1982, he and his partner, Fisher, were called to the Leal house in Lovington. Upon arrival, Fisher entered the house and saw defendant sitting on the couch holding K.L. When Fisher asked what the matter was, defendant said that K.L. was not breathing. When he asked what had happened, defendant said that the baby had fallen from her crib. Fisher testified that there were other people present when the ambulance arrived, but he could not remember whether anyone else was inside the house. He did notice

another child was in the room, but only when defendant asked whether she could take him with her in the ambulance. Young testified that when he entered the house, he saw defendant, her young son, and the baby in Fisher's arms. He was not asked whether anyone else was in the house. Fisher began cardiopulmonary resuscitation on the baby and continued it on the way to the hospital. At the hospital, several physicians worked to revive K.L., but on November 18, her heart stopped beating. She was thirteen months old.

Joyce Williams, who lived next door to the Leals, testified to what she saw and heard on November 14, 1982. She stated that on that morning, she had been outside and heard the cries of a child and a woman. Approximately twenty to thirty minutes later, defendant came over to ask to use the phone. Williams overheard the defendant ask to speak to her husband. About three to five minutes later, defendant returned and asked Williams to call an ambulance. Williams testified that she did not know who was in the Leal house that morning, although she noticed that the Leals' car was not there. She did not hear any disturbance in the house other than crying.

Examinations, X-rays, and an autopsy of K.L. revealed several injuries. There were two distinct, unrelated places of injury on the skull and facial bruises.

Dr. Beighley, the pathologist who conducted the autopsy, testified that the cause of death was trauma to the head, producing hemorrhaging in the brain and resulting in brain degeneration. Upon examination, he discovered a V-shaped indented fracture at the base of K.L.'s skull. He also testified that it was most likely she had been struck by an object, and not that she had fallen and struck an object. Further, he stated that it was highly unlikely a fall would have caused such an injury.

Dr. Loube, who treated K.L. in the emergency room, testified that K.L. had bruises on her chin and forehead, as well as swelling at the base of the skull. He estimated that the bruises occurred within twelve to

eighteen hours of the time she was admitted to the hospital.

Dr. Ward, a diagnostic radiologist, testified that he had examined X-rays of K.L.'s skull and found three fractures radiating from the base of the skull and separation of the tissue which connects the skull bones. He also testified that this type of fracture was inconsistent with a fall; a fall would most likely produce one linear fracture.

Although Dr. Groves, a neurosurgeon, testified that a fall from several feet could have caused the injuries, all medical experts agreed it was unlikely K.L.'s injuries were the result of a fall. They said the injuries were probably the result of a blow or blows to the head.

Detective Ron Black testified that he examined and photographed K.L.'s bedroom on November 19, 1982, pursuant to a search warrant. The crib rails appeared to be securely fastened and withstood certain testing for signs of malfunction. The floor was a carpeted hardwood floor.

**Whether Defendant's Conviction was Supported by Substantial Evidence**

█ Ordinarily, there are two components to a crime: an intent or mental state plus an overt act. 22 C.J.S. *Criminal Law* § 37 (1961). *See State v. Craig*, 70 N.M. 176, 372 P.2d 128 (1962). Section 30–6–1(C)(2) does not differentiate between child abuse committed knowingly, intentionally or negligently. Punishment for the crime will be the same regardless of which mental state is present. This section has, therefore, been characterized as a strict liability statute, *see State v. Fuentes*, 91 N.M. 554, 577 P.2d 452 (Ct.App.1978); *State v. Lucero*, 87 N.M. 242, 531 P.2d 1215 (Ct.App.1975), intended to protect children who are in need of greater protection than adults. The fact that we are not concerned with the level of criminal intent involved, however, does not alter the fact that defendant must have committed an unlawful *act*. Some act of commission or omission lies at the foundation of every crime. 22 C.J.S., *supra;* NMSA 1978, § 30–1–4 (Repl.Pamp.1984).

█ Section 30–6–1(C)(2) prohibits two acts—causing or permitting child abuse. In using the term "cause or permit," the legislature intended to provide flexibility. Since abuse will frequently occur in the privacy of the home, charging a defendant with "causing or permitting" may enable the state to prosecute where it is not clear who actually inflicted the abuse, but the evidence shows beyond a reasonable doubt that the defendant either caused the abuse or permitted it to occur. *Cf. State v. Lujan*, 103 N.M. 667, 712 P.2d 13 (Ct.App. 1985) (jury determined defendant's actions helped, encouraged or caused child abuse to be committed). This interpretation, like the mental state requirement, is consistent with the overriding purpose of protecting children. When no contrary legislative intent is indicated and the words are free from ambiguity, no other means of interpretation should be resorted to. *Id.* Thus, properly charged and proven, the statute covers the situation where it is not clear which individual actually inflicted the injury. *Cf. id.* (evidence did not show which occupant of defendant's car threw beer can which injured child).

█ However, "cause" and "permit" are distinct. One is active, the other passive. When the state chooses to charge under only one portion of the statute (that defendant "caused" or defendant "permitted" the abuse), the prosecution is limited to proving what it has charged. *See State v. Crump*, 82 N.M. 487, 484 P.2d 329 (1971); *State v. Armijo*, 90 N.M. 614, 566 P.2d 1152 (Ct.App.1977). *Cf. State v. Utter*, 92 N.M. 83, 582 P.2d 1296 (Ct.App. 1978) (the indictment alleged child abuse in six alternative ways). Here, defendant was charged with "permitting" K.L. to be cruelly punished. The state must, therefore, prove that she permitted the abuse to take place, not that she "caused or permitted" it.

We do not inquire whether the evidence in this case would support a conviction for "causing" K.L. to be cruelly punished because our answer would not change the

result. A defendant may not be convicted of a crime for which he was not charged or tried. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ Almost all of the state's evidence went to disproving the theory that the injuries were caused by an accident. While this shows that the child was cruelly punished, the medical testimony does not connect defendant to the punishment, either actively or passively. *See State v. Adams,* 89 N.M. 737, 557 P.2d 586 (Ct.App.1976). The fact that an injury occurred is not sufficient to prove this defendant guilty. *See State v. Coe,* 92 N.M. 320, 587 P.2d 973 (Ct.App.1978) (the statute does not apply to ordinary situations where a child is injured but only to those where the parent performs an abusive act or permits one to be performed).

No evidence was presented as to the time the fatal injury occurred. Medical testimony established that the bruises on the child's face had occurred within twelve to eighteen hours of the time the child was admitted to the hospital and that the injury to the back of the head "almost certainly" happened later, but there is no evidence as to how much later or how long before the hospital admission. The only other testimony concerning time is the neighbor's statement that she heard "a child" crying inside the house twenty to thirty minutes before defendant asked to use the phone. Evidence also shows, however, that defendant's young son was at home that morning. Without evidence as to when the injury occurred, the jury was required to speculate who was or might have been with K.L. when she was injured. This is impermissible. *See State v. Vigil,* 87 N.M. 345, 533 P.2d 578 (1975) (where evidence must be buttressed by surmise and conjecture, rather than logical inference in order to support a conviction, conviction cannot stand).

■ The state argues that the proof of cruel punishment permits an inference that defendant negligently permitted it to happen because there is no evidence that defendant acted to prevent it. This argument must be rejected. The burden is not on defendant to prove she tried to prevent the punishment; the state has the burden of proving beyond a reasonable doubt that she permitted the punishment. *State v. Losolla,* 84 N.M. 151, 500 P.2d 436 (Ct.App.1972).

In addition, the state's argument equates the concept of negligence and the word "permit." On these facts, "permit" refers to the proscribed act, the passive act of allowing the abuse to occur. "Negligence" refers to the standard against which the act must be evaluated in determining whether defendant is culpable.

The state did not prove defendant permitted the abuse to occur. There was no evidence that defendant was present when the child was injured, that she knew of a pattern of abuse, or had reason to suspect the child would be abused, and failed to act to prevent it. There is no proof of any act or omission by defendant. There is, therefore, no act or omission to measure against a standard of negligence.

There being no evidence to support the offense for which defendant was charged and convicted, her conviction must be reversed. *See Smith v. State,* 89 N.M. 770, 558 P.2d 39 (1976). Because of our holding, we do not reach the other issue raised by defendant. The case is remanded with instructions to dismiss the charge.

HENDLEY, C.J., and BIVINS, J., concur.