## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2016-NMSC-001

Filing Date: November 19, 2015

Docket No. S-1-SC-34549

STATE OF NEW MEXICO,

  Plaintiff-Respondent,

v.

JEREMY NICHOLS,

  Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Carl J. Butkus, District Judge**

Jorge A. Alvarado, Chief Public Defender
B. Douglas Wood, III, Assistant Appellate Defender
Santa Fe, NM

for Petitioner

Hector H. Balderas, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Respondent

## OPINION

**BOSSON, Justice.**

{1} A jury convicted Jeremy Nichols of child abuse resulting in death or great bodily harm, finding him guilty on a theory of negligently permitting medical neglect of his six-month-old son Kaden Nichols that allegedly resulted in the child's death. Finding the conviction unsupported by substantial evidence in the record, we reverse the conviction and dismiss the charge.

**BACKROUND**

1

**{2}** Alycia Nichols,[1] Jeremy Nichols' wife, gave birth to Kaden and his twin brother Bryce in September 2005. The twins were delivered by Caesarean section after the doctor made several unsuccessful attempts to get Kaden into a position where he could be delivered naturally. Kaden was stuck in the birth canal for a period of time, resulting in bruising over the majority of his body. Alycia described Kaden as "black and blue from head to toe."

**{3}** Because the babies were six weeks premature at delivery they remained hospitalized in the neonatal intensive care unit (NICU) at Presbyterian Hospital in Albuquerque for several weeks. They both had a gastroesophageal reflux disorder, a condition that allows food and acid to come from the stomach into the esophagus and mouth and causes irritation. They also had episodes of bradycardia, a condition that causes the heart rate to drop and requires "stimulation or oxygen to get it back up again."

**{4}** Kaden was discharged on October 24, 2005, after spending about six weeks in NICU. Bryce was sent home two weeks later. Following release from Presbyterian, the babies continued on medications to help with the reflux and slept with apnea monitors that measured breathing and chest wall movement.

**{5}** A few months after bringing the babies home, the parents started noticing little bruises, identified as petechiae, on both babies' arms and legs. At first, the parents thought the bruising was caused by swaddling the babies too tightly or by the way they burped the babies or by the way they held the babies in the air while playing. The bruising continued, however, and seemed to be worse on Kaden than on Bryce. Kaden also had experienced nosebleeds and bleeding around his gums.

**{6}** At the babies' four-month well-child appointment on January 24, 2006, Alycia told Dr. Eric Keller, the babies' pediatrician, that Kaden had a bloody nose almost every day and some bleeding gums. Dr. Keller decided not to administer vaccinations to either baby because he was concerned about the unresolved bleeding problems.

**{7}** Dr. Keller referred Kaden to Tricore Lab and ordered several blood tests. The blood test results were abnormal, so Dr. Keller advised the parents to take Kaden to a hematologist at University of New Mexico Hospital (UNMH). Shortly after the referral was made for Kaden, Alycia's mother called Dr. Keller's office and asked that the doctor also refer Bryce, stating, "Bryce['s] bruising [is] worse than Kaden['s]." Both babies were seen by the hematologist.

**{8}** Following the appointment with the hematologist, UNMH left Alycia a message stating that the blood test results were normal for both babies. Alycia then rescheduled the

---

[1]Alycia Nichols and Jeremy Nichols are divorced. During the course of these proceedings Alycia remarried and changed her name. However, she was Alycia Nichols at the time the events in this case took place.

babies' four-month vaccinations with a nurse at Dr. Keller's office. Shortly before that appointment, however, the parents noticed bruising on Bryce's abdomen.

**{9}** On the morning of March 15, 2006—two days before Jeremy was criminally accused of medical neglect—Alycia and Jeremy took the babies to Dr. Keller's office for the vaccination appointment and showed Bryce's abdominal bruise to the nurse. The nurse called Dr. Keller. Dr. Keller asked the parents whether they had the results from the hematologist appointment and then called UNMH himself to get a clear answer. Dr. Keller decided not to administer the shots at that time and scheduled another exam for the following week.

**{10}** That night, Alycia and Jeremy went out to dinner with relatives. Jeremy's sister, Jennifer, babysat Kaden and Bryce at the Nichols' apartment. Alycia asked Jennifer to keep the babies awake until Alycia and the others returned from dinner because she wanted the relatives to meet the twins. She also asked Jennifer to feed the babies and put them in clean outfits.

**{11}** After dinner, everyone returned to the Nichols' apartment to see the babies. Both babies were recovering from colds, and Jennifer informed the parents that the babies had been a little fussy. Alycia noticed "[Kaden] was acting very different than he normally acts." Alycia took the babies' temperatures, which were normal, and checked on the babies during the night. She was "worried about [Kaden] because of how he was acting, and woke up like every forty five minutes just from worrying, touching him and touching his tummy to make sure he was still breathing."

**{12}** On the morning of March 16—the day of Kaden's death—Alycia woke the babies up at about 6:45 a.m., fed them bottles, and bathed them. She put the babies in their room and left around 9:00 a.m. to run errands. She testified that the babies appeared to be acting normally. "As far as I can recall, [Kaden] was himself. I don't remember him being sick or pale or anything like that. I remember him just being himself."

**{13}** While Alycia was gone, Jeremy tried to feed the babies cereal. Bryce ate, but Kaden would not eat and was blowing the food out of his mouth. Jeremy said it appeared that Kaden was hungry but just could not swallow the food. When Alycia came home, Bryce was napping and Jeremy was holding Kaden, who was fussy. Alycia took a shower and got dressed, and then at about noon she and Jeremy awoke the babies to feed them. According to Alycia, the babies appeared normal, "[p]erfect" in fact. Alycia then left for a 12:45 hair appointment at a nearby mall.

**{14}** Jeremy, in an attempt to calm Kaden, put on a movie and sat with him on the couch. According to Jeremy, Kaden would go "in and out" between being content and being fussy. Jeremy tried to feed Kaden a bottle because he thought Kaden was hungry, but Kaden only took about two cubic centimeters, which was much less than he normally took.

3

**{15}**     When Alycia finished her hair appointment, she called Jeremy to see if she should go to the store. She could hear crying in the background, a cry she described as an "I want to be held" cry, not an inconsolable cry. Jeremy told Alycia that the boys were acting fussy and asked her to come straight home.

**Emergency Treatment: Kaden**

**{16}**     Alycia arrived home approximately fifteen minutes later, around 3:15 p.m. When she walked in, Jeremy was rocking Kaden on the couch, and Bryce was in his crib. Alycia noticed that Kaden's legs seemed "ashy" and thought his diaper was too tight or that Jeremy was holding him too tightly. Kaden also appeared to be lethargic. Alycia took Kaden's temperature and it was 95. Jeremy wrapped Kaden in a blanket and gave him "baby Tylenol." Five or ten minutes later, Jeremy and Alycia retook Kaden's temperature and it was 95.7.

**{17}**     Thinking Kaden was "just sick" and not in a "life threatening" situation, Alycia called her aunt for advice on how to treat him. Her aunt was a pediatric nurse who provided healthcare advice by phone. Alycia was on the phone with her aunt for about fifteen minutes. While Alycia was on the phone with her aunt, Jeremy noticed Kaden's breathing become increasingly lighter and Alycia noticed his legs getting more discolored. Alycia's aunt advised Alycia to call 911.

**{18}**     At 3:39 p.m., Alycia called 911. Jeremy began infant CPR on Kaden. While Alycia was on the phone with the 911 operator, Jeremy told her that Kaden had stopped breathing.

**{19}**     The paramedics arrived eight minutes later at 3:47 p.m. and went to the back bedroom where Jeremy was giving Kaden CPR. Kaden was unconscious, was not breathing on his own, and had no pulse. The paramedics initiated CPR, attempted to ventilate Kaden with a bag-valve mask, and inserted an intraosseous line to administer medications to the bloodstream.

**{20}**     Having no success with resuscitation, the paramedics transported Kaden by ambulance to the Lovelace West Mesa Medical Center (Lovelace). Kaden arrived at Lovelace at 4:28 p.m. Dr. Sanjay Kholdwadwala, the emergency room doctor who took over Kaden's care, continued CPR and administrated medications but Kaden never regained consciousness. Kaden was pronounced dead at 4:47 p.m. An autopsy of Kaden revealed pooled blood in his abdomen and a large laceration to his liver. His cause of death was determined to be loss of blood associated with blunt abdominal trauma and the lacerated liver.

**Emergency Treatment: Bryce**

**{21}**     Bryce was also transported to Lovelace on March 16. The paramedic attending to Bryce told Alycia that Bryce's "vitals were fine" and his temperature and heart rate were

likely elevated because of the commotion, but Alycia insisted that he was in need of treatment. She told the paramedics that "just minutes ago Kaden looked the same way as Bryce does right now, and Bryce is heading in the same direction and whatever is happening to Kaden is happening to Bryce." The paramedics finally agreed and transported Bryce and Alycia in an ambulance to Lovelace.

**{22}** Bryce arrived at Lovelace at 4:45 p.m. Dr. Kholdwadwala, after leaving Kaden, checked Bryce's vital signs and ordered a transfer to UNMH for treatment because Lovelace did not have a pediatric intensive care unit. Bryce was admitted to UNMH that day. CT films revealed fluid around his liver indicating a mild liver injury. Bryce was discharged from UNMH on March 21, 2006.

**Criminal Charges**

**{23}** On suspicion that the injuries to both babies were a result of child abuse, detectives from the Albuquerque Police Department were dispatched to Lovelace to conduct an investigation. After several interviews with both parents and several of the medical professionals who attended to Kaden and Bryce, the detectives identified Jeremy as the sole suspect. On March 17, 2006, the day after Kaden died, Jeremy was arrested and charged with multiple counts of first-degree felony child abuse contrary to NMSA 1978, Section 30-6-1(D)(1) (2005, amended 2009).

**DISCUSSION**

**{24}** Section 30-6-1(D)(1) defines the crime of child abuse: "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health." Abuse of a child that does not result in death or great bodily harm is, for the first offense, a third-degree felony. *See* § 30-6-1(E). However, if the abuse results in great bodily harm to or death of the child, then the offense is a first-degree felony with a mandatory sentence of at least eighteen years' incarceration. *See id.* (providing that child abuse resulting in great bodily harm is a first-degree felony); § 30-6-1(F) (providing that negligent child abuse resulting in the death of a child is a first-degree felony); § 30-6-1(G) (providing that intentional child abuse resulting in the death of a child twelve to eighteen years of age is a first-degree felony); NMSA 1978, § 31-18-15(A)(3) (2005, amended 2007) (providing that the basic sentence for a first-degree felony is eighteen years imprisonment); *see also* § 30-6-1(H) (providing that child abuse resulting in the death of a child less than twelve years of age is a first-degree felony); § 31-18-15(A)(1) (providing that the basic sentence for a first-degree felony resulting in the death of a child is life imprisonment).

**{25}** At trial, the State alleged more than one theory for how Jeremy had placed Kaden in a situation that endangered his life and caused his death and a theory of how Jeremy had placed Bryce in a situation that endangered him and caused him great bodily harm. The State's theories were, in summary:

(1)　　that Jeremy either intentionally or negligently caused or permitted the fatal abdominal and liver injuries that resulted in Kaden's death; the jury found Jeremy *not guilty* of all such charges;

(2)　　that Jeremy either intentionally or negligently *caused* endangerment to Kaden by medical neglect, failing to provide or obtain medical care necessary for Kaden's well-being, resulting in his death or great bodily harm; the jury also found Jeremy *not guilty* of all such charges;

(3)　　that Jeremy negligently *permitted* endangerment to Kaden by the same medical neglect resulting in death or great bodily harm, for which the jury found Jeremy *guilty* of a single charge;

(4)　　that Jeremy permitted endangerment to Kaden by medical neglect *not* resulting in death or great bodily harm; the jury found Jeremy *not guilty* of this charge; and

(5)　　that Jeremy either intentionally or negligently caused or permitted endangerment to Kaden's brother, Bryce, that resulted in great bodily harm; the jury found Jeremy *not guilty* of all such charges.

**{26}**　To recapitulate, after a fourteen-day trial the State was unsuccessful in proving beyond a reasonable doubt that Jeremy caused or permitted Kaden's fatal injuries or that Jeremy caused endangerment by medical neglect. Out of multiple charges and alternative charges, the jury found Jeremy guilty of a single count: negligently permitting endangerment by medical neglect resulting in Kaden's death. Jeremy's conviction for permitting medical neglect of Kaden was based on a theory not of inflicting the fatal injuries but on one of not providing or obtaining necessary medical care to save Kaden's life. The district court sentenced Jeremy to the basic term of eighteen years' imprisonment.

**{27}**　Jeremy appealed his conviction on several grounds including, relevant to this opinion, that the jury verdict was not supported by substantial evidence. After reviewing the evidence, our Court of Appeals affirmed Jeremy's conviction. *State v. Nichols*, 2014-NMCA-040, ¶¶ 1, 2, 321 P.3d 937. We granted certiorari. 2014-NMCERT-003.

**{28}**　The theory on which the State presented its one successful count—negligently permitting medical neglect—gives rise to at least one legal issue in the context of this case where the jury also found Jeremy not guilty of causing medical neglect. We address that legal issue—and the hopeless confusion left by conflicting jury verdicts—in the hope of providing clarity for the benefit of future prosecutions. We then proceed to the main question: whether Defendant's single conviction finds evidentiary support in the record.

**In the context of medical neglect, *causing* and *permitting* define identical criminal acts, giving rise to conflicting verdicts in this case**

**{29}**　As previously set forth, the State presented separate charges for causing endangerment by medical neglect and permitting endangerment by medical neglect. First, the State charged that Jeremy "caused" Kaden's medical neglect (either intentionally or

6

negligently) by failing to obtain necessary medical care, which resulted in Kaden's death. The jury returned not guilty verdicts on these charges, thereby establishing a jury finding that Jeremy did not cause medical neglect.

**{30}** The State also submitted a charge that Jeremy negligently "permitted" medical neglect of Kaden. The district court gave the following instruction:

> For you to find Jeremy Nichols guilty of child abuse resulting in death or great bodily harm, . . . the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.      Jeremy Nichols permitted Kaden Nichols to be placed in a situation which endangered the life or health of Kaden Nichols, to wit: medical neglect;
>
> 2.      The defendant acted with reckless disregard and without justification. To find that Jeremy Nichols acted with reckless disregard, you must find that Jeremy Nichols knew or should have known the defendant's actions or failure to act created a substantial and foreseeable risk, the defendant disregarded that risk and the defendant was wholly indifferent to the consequences of the failure to act or conduct and to the welfare and safety of Kaden Nichols;
>
> 3.      Jeremy Nichols was a parent, guardian or custodian of the child, or the defendant had accepted responsibility for the child's welfare;
>
> 4.      Jeremy Nichols's actions or failure to act resulted in the death of or great bodily harm to Kaden Nichols;
>
> 5.      Kaden Nichols was under the age of 18;
>
> 6.      This happened in New Mexico on or between the 15th day of March, 2006 and the 16th day of March, 2006.

**{31}** The jury, after finding Jeremy not guilty of causing medical neglect, found him guilty of negligently permitting medical neglect, meaning that the jury must have drawn a distinction between *causing* and *permitting* medical neglect. Jeremy, in a post-trial motion, argued that there was no meaningful distinction between causing and permitting medical neglect in the context of this case, thus properly preserving the issue for appellate review. *See State v. Lopez*, 2007-NMSC-037, ¶ 15, 142 N.M. 138, 164 P.3d 19 ("In order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon.").

**{32}** Our courts have repeatedly stated that "causing" and "permitting" child abuse are

7

distinct theories, one premised upon active abuse (causing), the other upon "the passive act of allowing the abuse to occur" (permitting). *See State v. Cabezuela*, 2011-NMSC-041, ¶ 26, 150 N.M. 654, 265 P.3d 705 (quoting *State v. Leal*, 1986-NMCA-075, ¶¶ 13, 19, 104 N.M. 506, 723 P.2d 977 (internal quotation marks omitted)). Our Court of Appeals in *Leal* held that ordinarily these theories must be charged in the alternative, unless "it is not clear who actually inflicted the abuse, but the evidence shows beyond a reasonable doubt that the defendant either caused the abuse or permitted it to occur." 1986-NMCA-075, ¶¶ 13-14. The exception recognized in *Leal* typically would arise when the evidence shows that a child was abused in the presence of two or more caregivers, one who actually inflicted the abuse while the other stood by, passively permitting the abuse to take place. *See id.* ("Thus, properly charged and proven, the statute covers the situation where it is not clear which individual actually inflicted the injury."). Absent such evidence the general rule would apply, that *causing* and *permitting* child abuse are distinct theories that must be charged in the alternative when supported by the evidence.

**{33}** Implicit in *Leal*'s reasoning is that *causing* child abuse is synonymous with inflicting the abuse, and *permitting* child abuse refers to the passive act of failing to prevent someone else—a third person—from inflicting the abuse.[2] Put another way, causing and permitting abuse correlate with primary and secondary responsibility for the victim's injury. By including both theories in the statute, the Legislature ensured that both active and passive abusers would be held equally responsible.

**{34}** Causing and permitting abuse seem to lose their distinction, however, when the charge is based on a theory of endangerment by medical neglect. In that context, there is no distinct active and passive, or primary and secondary, conduct. Medical neglect, by definition, can only be charged when someone fails to seek or provide necessary medical care, a theory that implies passive involvement. *See Black's Law Dictionary* 1196 (10th ed. 2014) (defining "medical neglect" as "[f]ailure to provide medical, dental, or psychiatric care that is necessary to prevent or to treat serious physical or emotional injury or illness"); *see also* § 30-6-1(A)(2) ("'[N]eglect'" [for purposes of the child abandonment or abuse statute] means that a child is without proper parental care and control of subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or

---

[2]The latter notion that permitting child abuse requires evidence of an active abuser is reflected in our caselaw. *Accord, e.g.*, *State v. Lopez*, 2007-NMSC-037, ¶¶ 8, 35 (affirming the defendant-mother's convictions of negligently permitting child abuse when the father admitted that he had dropped the infant-victim after throwing her into the air and hitting her against the ceiling); *State v. Vasquez*, 2010-NMCA-041, ¶¶ 1-2, 148 N.M. 202, 232 P.3d 438 (affirming the defendant-mother's conviction for negligently permitting child abuse at the hands of the victim's father); *but cf.*, *State v. Trossman*, 2009-NMSC-034, ¶ 24, 146 N.M. 462, 212 P.3d 350 (reversing defendant's conviction for negligently permitting child abuse where there was no evidence of active abuse (exposure to chemicals used to manufacture methamphetamine) by another).

habits of the child's parents, guardian or custodian or their neglect or refusal, when able to do so, to provide them.").

**{35}** Logically, however, permitting endangerment by medical neglect makes no sense. A person, acting alone, does not permit himself or herself to fail to seek medical care. And in the case of two or more people present when the medical neglect occurs, each person independently either fails to act and is culpable for endangerment by medical neglect, or does not fail to act in which case there is no neglect. In both situations, each person who fails to act is primarily responsible and therefore must have caused the abuse.

**{36}** Thus, while causing and permitting child abuse are in most cases distinct theories that can be charged in the alternative, in the specific context of endangerment by medical neglect, charging a defendant with permitting abuse is likely to cause confusion. In this case, the State alleged that Jeremy both caused and permitted endangerment by medical neglect, without providing any explanation of the difference between the two theories. The State cannot offer a confusing array of evidence, submit several vague jury instructions on various potential theories, and leave to the jury the responsibility of putting it all together to find a basis for a conviction. *Cf., e.g.*, *State v. Cabezuela*, 2015-NMSC-016, ¶ 37, 350 P.3d 1145 ("Part of the fundamental-error analysis is 'whether a reasonable juror would have been confused or misdirected by the jury instruction.'" (quoting *State v. Sandoval*, 2011-NMSC-022, ¶ 13, 150 N.M. 224, 258 P.3d 1016)). As a result, the verdicts rendered by the jury—not guilty of causing medical neglect and guilty of permitting medical neglect—hopelessly conflict under our legal analysis and preclude any determination of which culpable act was the actual basis for the jury's conviction of Jeremy.

**{37}** However, we need not base our ultimate decision on the foregoing legal analysis. Our review of the record demonstrates that the State did not prove, and indeed presented *no evidence* to prove, an essential element in the crime—that Jeremy's alleged endangerment by medical neglect actually caused Kaden's death. The State also failed to prove that Jeremy acted "with reckless disregard." For those reasons, his conviction must be reversed and the charges vacated.

**The evidence presented does not establish that medical neglect caused Kaden's death**

**{38}** For this Court to uphold a conviction of first-degree child abuse on a theory of endangerment by medical neglect, the statute requires proof of causation. In this case, as the jury was instructed, the State had to prove that Jeremy's "actions or failure to act resulted in the death of or great bodily harm to Kaden Nichols." Under the statute, "[i]f the abuse results in great bodily harm to [or death of] the child, the [accused] is guilty of a first-degree felony." Section 30-6-1(E)-(F). On the other hand, child abuse by endangerment "that does not result in the child's death or great bodily harm is, for a first offense, . . . a third degree felony," § 30-6-1(E), for which the jury found Jeremy not guilty.

**{39}** Causation must be proved by substantial evidence. As we recently stated in *State v.*

9

*Consaul*, issued by this Court after the trial in the case at bar, "[w]ithout any proof of causation, the charge of criminal negligence (or now criminal recklessness) [resulting in death or great bodily harm] completely fails for lack of substantial evidence . . . ." 2014-NMSC-030, ¶ 49, 332 P.3d 850. To illustrate, under the State's overarching, yet unsuccessful, theory of culpability—that Jeremy inflicted the liver injury—proving causation would not have been a problem. The medical evidence clearly established a connection between the liver injury and Kaden's death. But the jury found Jeremy not guilty of inflicting the liver injury.[3]

**{40}** Under a theory of medical neglect that results in death or great bodily harm, the State must prove more than just the neglect itself. In this case, the State was required to put forth substantial evidence that Jeremy's neglect "resulted in" Kaden's death or great bodily harm, meaning that medical neglect was at least a significant cause of his death or great bodily injury. *See Consaul*, 2014-NMSC-030, ¶¶ 48-49; *see also* UJI 14-251 NMRA (requiring the jury to find in a homicide case that "[t]he act of the defendant was a significant cause of the death of [the victim]"). In other words, the State needed medical evidence that if Jeremy had obtained medical care earlier, Kaden would have lived or at least would have had a significantly greater chance of living—evidence that the alleged neglect actually contributed to the tragic result. But the State never offered any such evidence.

**{41}** Kaden's autopsy revealed that the cause of death was loss of blood associated with blunt abdominal trauma and a lacerated liver. Dr. Jeff Nine, the forensic pathologist who supervised Kaden's autopsy, testified that "there was a large laceration . . . mean[ing] that something, a blunt object of some sort, had struck the decedent or the decedent had struck a blunt object that caused pressure on the abdomen so severely that it broke the liver essentially in half from the back to the front."

**{42}** Dr. Nine testified that it is possible to survive a severe liver injury with the right kind of treatment, but stated he "[did not] think someone could have survived this injury without pretty extensive medical intervention because that's a laceration that goes all the way through the liver." Dr. Shawn Ralston, the pediatric hospitalist who treated Bryce, testified that a liver can repair itself without surgery but that such injuries often require a blood transfusion to replace the blood that is lost.

**{43}** This is evidence that liver injuries may be treatable, but sheds no light on when that

---

[3]We note that even with respect to its charge that Jeremy inflicted the fatal injuries, the State also relied on a theory of child abuse by endangerment under Section 30-6-1(D)(1): that Jeremy "caused Kaden Nichols to be placed in a situation that endangered the life or health of Kaden Nichols." We do not reach the propriety of that theory under the evidence presented in this case, but we note that Section 30-6-1(D)(2) would be a better fit. *See id.* ("Abuse of a child consists of a person knowingly, intentionally or negligently . . . causing or permitting a child to be . . . tortured, cruelly confined or cruelly punished . . . .").

intervention would have been necessary to save Kaden or give him an appreciably better chance of survival. Had Dr. Nine or Dr. Ralston been asked to testify that two hours, one hour or even twenty minutes would have made a material difference in Kaden's chance of survival, then the jury would have had some factual basis for its decision to convict Jeremy of a crime *resulting* in death. But there was no such testimony, and we wonder whether any medical expert could have provided such testimony.

**{44}** Without such testimony, the jury was left to speculate that if Jeremy had called 911 sooner, then perhaps the doctors would have had time to diagnose Kaden's condition and treat him successfully, such as with a blood transfusion, to prevent him from bleeding to death. Indeed, the prosecutor *invited* the jury to speculate. During closing argument, all the prosecutor could say about medical neglect was:

> And maybe, as you heard from the testimony, maybe had Kaden gotten medical attention after [his liver] injury was inflicted on him, maybe he would have survived as Bryce did. Bryce's injuries, of course, were not as severe as Kaden's, but perhaps Kaden would have been able to celebrate his first birthday.

**{45}** Clearly, a suggestion that "maybe" or "perhaps" something would or would not have happened, even if based on evidence, is not probative of anything. It is certainly not probative beyond a reasonable doubt that something would have happened—in this case the statutory element included in the jury instruction that "Jeremy Nichols' actions or failure to act resulted in the death of or great bodily harm to Kaden." Without some evidence to establish that causal connection, we are left with no more than medical neglect in a vacuum, which can constitute criminal endangerment, but not a first-degree felony.[4] *See* § 30-6-1(E) ("A person who commits abuse of a child that does not result in the child's death or great bodily harm is, for a first offense, guilty of a third degree felony . . . .").

**{46}** Our review of the trial transcript brings one possible reason for the lack of causation evidence to light. This trial was really never about medical neglect; it was about the State's theory that Jeremy battered Kaden. The State pointed repeatedly to evidence of bruising and similar injuries on both children over time, and the State blamed Jeremy. The State's theory of the fatal liver injury was that Jeremy, acting alone, caused it during the last three hours of Kaden's life before Alycia's last-minute return, when both children were alone with

---

[4]We note the novelty of the State's theory of medical neglect as a form of child endangerment. While we do not find the theory objectionable on its face, this case demonstrates the care that must be taken to ensure that every theory presented to the jury is supported by the evidence. *Cf. State v. Montoya*, 2015-NMSC-010, ¶ 42, 345 P.3d 1056 ("When a defendant is charged with intentional child abuse resulting in the death of a child under twelve, the instruction on the lesser-included offense of reckless child abuse should only be given if the evidence could support such a theory.").

11

Jeremy. The State argued,

> The Defendant, for whatever reason, and there doesn't have to be a reason, took the life of Kaden Nichols on March 16th of '06. Whether he was being fussy because he wasn't eating because he couldn't use a spoon yet, because he was just tired, Defendant was tired of watching after the kids. He took care of those kids for about six hours. Alycia was home for a short portion of that time, checked on the kids, they were fine. The evidence that you have in front of you is that those kids were fine at 12:30 before Alycia left. Alycia didn't kill Kaden, the Defendant killed Kaden and the Defendant caused those injuries to Bryce that day on March 16th of 2006.

{47}    Only then, almost as an afterthought to her closing, did the prosecutor speculate that "maybe" Kaden would have survived if he had gotten medical attention "after that injury was inflicted on him." Those few lines in the State's closing argument are the *only* mention of medical neglect in the State's entire closing. The rest was all about battery—inflicting the liver injury. And, of course, the jury returned a not-guilty verdict on that battery charge. Because the State lost the jury on its principal theory and failed to offer substantial evidence to prove its fall-back position, the State cannot be heard to complain. Jeremy's conviction must be reversed and the charges against him vacated for lack of substantial evidence.

**The State did not present substantial evidence to establish beyond a reasonable doubt that Jeremy acted with reckless disregard**

{48}    In addition to proving causation, the State had to offer substantial evidence that Jeremy's conduct, in failing to provide medical care early enough, amounted to reckless disregard for the welfare and safety of Kaden. As stated above, the jury was instructed that "[t]o find that Jeremy Nichols acted with reckless disregard, you must find that Jeremy Nichols knew or should have known [his] . . . failure to act created a substantial and foreseeable risk, [he] disregarded that risk and . . . was wholly indifferent to the consequences of his failure to act."

{49}    If the jury had found that Jeremy inflicted the blows that lacerated Kaden's liver, or that he was on notice that someone else had inflicted those blows, then Jeremy would have been on notice of the need for medical care. He would have observed the resulting symptoms in Kaden and, more importantly, he would have been on notice that those symptoms were serious and required immediate medical attention. Had Jeremy failed to act under those circumstances, the jury could easily have returned a verdict—supported by substantial evidence—that Jeremy was "wholly indifferent" to Kaden's welfare and "the consequences of his failure to act." But the jury found Jeremy *not guilty* of inflicting those blows. And it is undisputed that during those three hours from noon to 3:00 p.m. on March 16, 2006, before Alycia returned home, Jeremy was alone with the babies; no other adult was present whom Jeremy could have witnessed inflicting those tell-tale blows. Without first-hand knowledge of the source or severity of Kaden's injuries, the State had to offer other evidence

12

to prove that Kaden's symptoms were so clear and obvious that Jeremy was criminally reckless in failing to seek immediate medical attention.

**{50}** In its briefing to this Court, the State argues that mundane observations like Kaden's fussiness and his decreased appetite should have alerted Jeremy to Kaden's need for medical care. Yet this was a baby with multiple, birth-related problems and concomitant symptoms almost his entire life. Kaden had been taken to regular medical appointments as well as to specialized follow-up appointments. The day before his death, *both* parents took Kaden to a medical appointment at which his symptoms were discussed with medical personnel. That night the babysitter, who was Jeremy's sister, and other family members observed Kaden. The State pointed out in closing argument that on the day of Kaden's death, March 16, 2006, Kaden's condition, both early in the morning and at noon, appeared to Alycia to be unremarkable. Alycia saw no need to call for any medical assistance. If Jeremy was criminally reckless earlier that day or before, then it would appear so too were Alycia and perhaps others.

**{51}** No one called for emergency assistance until around 3:00 that afternoon, when Kaden's breathing began to falter. On what evidence then, was the jury to have concluded that Jeremy was guilty of "reckless disregard" and being "wholly indifferent to the consequences of his failure to act"? Nothing in this record provides a satisfactory answer to that question. We cannot write an opinion saying that an infant's fussiness and lack of appetite are of such moment that a parent's failure to call 911 might put him in jail for felony child abuse. And, as we have previously explained, any theory that Jeremy was reckless for not calling 911 during the time when he had exclusive control from noon until 3:00 p.m. is inconsistent with the jury finding him not guilty of inflicting the fatal injuries during that same time.

**{52}** Based on this record, we cannot say with any degree of confidence what evidence would have put Jeremy on notice of Kaden's critical need of medical care, in light of the jury's finding that Jeremy did not inflict the injuries that resulted in Kaden's death. Even the State's legal arguments fail to offer any guidance. We are left utterly confused by the jury's verdict.

**{53}** Substantial evidence might have supported a verdict that Jeremy inflicted the fatal blow to Kaden's liver, but the jury was not so persuaded. Instead, the jury found that Jeremy was "wholly indifferent" and "reckless" for not seeking medical care, a verdict altogether unsupported by substantial evidence in the record. We cannot sustain any verdict on that basis.

**CONCLUSION**

**{54}** We reverse Jeremy Nichols' child abuse conviction under Section 30-6-1 and order that the charge be dismissed with prejudice.

13

**{55}    IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice,
Retired, Sitting by Designation**

**WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**